## NATIONAL LABOR RELATIONS BOARD
v. NU–CAR CARRIERS, Inc.

No. 10437.

United States Court of Appeals
Third Circuit.

Argued May 22, 1951.

Decided June 13, 1951.

that respondent violated Sections 8(a) (1) and 8(a) (3) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 158, by interfering with concerted activities of its employees, and particularly in discharging one of them. Jurisdiction is undisputed. The substantial issue in the case is whether respondent's drivers are "employees" within the meaning of the Act. Unless they are, the provisions concerning unfair labor practices are irrelevant to this case, for by its very terms the 1947 statute excludes from its operation "any individual having the status of an independent contractor". 29 U.S.C.A. § 152 (3).

The statute however does not define the status of an independent contractor. We are therefore thrown back upon common law concepts. The Restatement of Agency does not define independent contractor either, but it gives a list of matters of fact to be considered in deciding whether one acting for another is a servant or an independent contractor. It states however that, "The important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results." Restatement, Agency § 220 (1933). We may add to this Judge Learned Hand's statement: "The test lies in the degree to which the principal may intervene to control the details of the agent's performance; and that in the end is all that can be said * * *." Radio City Music Hall Corp. v. United States, 2 Cir., 1943, 135 F.2d 715, 717.[1]

Mozart Ratner, Washington, D. C. (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Owsley Vose, Louis Schwartz, attorneys, National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

Jacob S. Spiro, Jersey City, N. J. (A. Harry Moore and Jacob S. Spiro, both of Jersey City, N. J., on the brief), for respondent.

Before GOODRICH, STALEY and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

The National Labor Relations Board brings this action for a decree enforcing its cease and desist and reinstatement order against respondent. The Board found that the agreement under which the drivers operated "placed all essential controls over the equipment and the manner and details of the work performed, in the hands of the Respondent." 88 N.L.R.B. 75 (1950). It concluded therefore that the drivers were employees and not independent contractors. Respondent does not quarrel

Both the trial examiner and the Board used the "conventional, common law test of the 'right to control'" and found that the agreement under which the drivers operated "placed all essential controls over the equipment and the manner and details of the work performed, in the hands of the Respondent." 88 N.L.R.B. 75 (1950). It concluded therefore that the drivers were employees and not independent contractors. Respondent does not quarrel

---

1. See also N. L. R. B. v. Steinberg, 5 Cir., 1950, 182 F.2d 850, 854; N. L. R. B. v. Phoenix Mutual Life Ins. Co., 7 Cir., 1948, 167 F.2d 983, 986, 6 A.L.R.2d 408.

with the legal test applied by the Board, but contends that its conclusion was wrong.

We need not venture into the question of whether the ultimate conclusion of employer-employee relationship based upon undisputed underlying evidentiary fact is one of fact or law.[2] Whether the Board's finding be viewed as one of fact or as a conclusion of law, we think it is correct. The degree of control over the work of its drivers which respondent had the right to exercise under the "sale" and "lease" agreements is so great as to make the drivers clearly "employees" within the coverage of the Labor Relations Act, and not "independent contractors."

Here are the facts which have led us to this conclusion. Respondent, Nu-Car Carriers, Inc., is engaged in the business of transporting new automobiles to dealers from assembly plants of the Ford Motor Company. Its New Jersey terminal, located in Raritan adjacent to a Lincoln-Mercury plant is the only one here involved. It was opened in April, 1948. Before beginning operations or engaging any drivers respondent entered into an agreement with the local A.F. of L. Teamsters Union. The agreement provided that respondent was to operate only under the "owner-operator system" and to contract only with union members.

The "owner-operator" plan was as follows: The "owner-operator" and the company were to execute simultaneously two documents called "Agreement of Sale" and "Lease of Equipment Agreement." In the sale agreement the company agrees to sell a tractor to the owner-operator for a cash down-payment of $200 and an interest-free note for the $1800 balance. This balance is to be paid at a stated mileage rate out of earnings under the accompanying lease agreement. By the lease agreement the owner-operator agrees to lease the tractor to the company for use with an automobile-carrier trailer supplied by the company. The lease is for a year and is automatically extended from year to year, but is terminable by either party on 10 days' written notice. Under it the owner-operator agrees to work exclusively for the respondent and operate and maintain the tractor at his own expense in return for a stated compensation per mile.

By June, 1948, when the alleged unfair labor practice occurred, respondent had 28 drivers operating out of its Raritan terminal, all under the system outlined above. None of these owned his tractor or trailer before he came to work for respondent, and each "purchased" and leased back to respondent only one tractor. The company handles each year at its Raritan terminal $10,000,000 worth of new automobiles, all of which it delivers by truck.

The rights and obligations of the parties are set out in the sale and lease agreements in detail. They provide[3] that title is to remain in the company during the term of the lease and reserve to the company the option to purchase the tractor at the average "as is" value upon the termination of the agreement for any reason. Payment on the note may be postponed on request in the event that the company fails to provide driver with a gross income of $100 per week. The company reserves the right to terminate the agreement if the driver "does not operate in harmony with and to the best interests of all persons" in the automotive industry with whom he has contact.

The agreements themselves, without more, make it clear that respondent's drivers were not independent contractors even under the strictest of common law agency tests. The lease provides that the tractor is to be used solely "under the direction and supervision of the Company," and that "the operation of all leased vehicles and equipment shall [be] under exclusive and direct supervision and control of Com-

---

2. Restatement, Agency § 220, comment b (1933) says that where the inference either way is clear it is made by the court; "otherwise the jury determines the question after instruction by the court as to the matters of fact to be considered."

3. The two writings must be read together as a single agreement. They are so mutually dependent and interrelated that many of the terms of the sale are contained in the lease agreement and vice versa.

pany." If the company has not reserved by this language the right to control the manner and means of driving these tractor-trailers and loading and unloading them, there are not words in the English language capable of doing so. There is no provision requiring the driver to be on the job so many days a week and so many hours a day, but in the very nature of the work this is not to be expected. Regularity and availability are guaranteed by the provisions that the driver must work "exclusively and loyally for the Company" and "be subject to call by Company for the rendering of service with equipment at all times."

■ Respondent relies heavily on two things: (1) the fact that each driver owns the truck which he drives and (2) the method of compensation. If the driver "owns" the truck, his ownership is qualified in ways not usual for owners. He gets no right to possession of the tractor. The most he gets is the right to drive it on company business when instructed to do so. "Title" remains in the company for the duration of the lease. The company reserves at all times the right to repurchase the vehicle. The fact of ownership of tools or equipment is helpful in deciding whether one is an independent contractor only because of the inference of right of control arising from ownership. But if the owner, as part of the agreement to perform service, surrenders complete dominion over the instrumentality and the right to decide how it shall be used, as here, then the fact of ownership loses its significance. These sale and lease agreements give the company such extensive dominion and control over the operation of the tractor as to render the owner-operator's ownership, if such it is, meaningless on the question of whether he is an employee.

Turn now to the method of compensation under these agreements. The driver's compensation is computed by crediting him with a gross "rental" of so much per mile varying with the number of cars hauled per load and the length of the trip. From this sum deductions are made for fuel, repairs, insurance, etc. charged to the company, and for withholding and social security taxes. The company guarantees minimum net earnings of 11 cents per loaded mile. All fuel and maintenance is to be obtained at the company garage except for "road" purchases, which were to be charged to the company at specified stations.

It is not apparent how this method of compensation shows the drivers to be independent contractors. What little inference of right to control in the driver that arises from such a method of compensation, as opposed to a straight hourly wage rate, is overshadowed by the express contract elaborately providing for company control.

■ The test for determining whether the employer-employee relationship exists is right to control, not the actual exercise of control. However, the evidence as to what the parties actually did in this case merely strengthens the conclusion that respondent controlled the manner and means of doing the work.

It was brought out at the hearing before the trial examiner that the company maintained and used a "safety patrol car" to check up on the driving of the owner-operators. There was testimony of specific instances where warnings were given of rule violations detected by this patrol and two drivers were "terminated," one because he was "accident prone," the other for permitting his brother to ride in the cab with him in violation of the agreement. In addition, the company issued and enforced a rule that all tractors and trailers be parked in the company lot overnight. On the other hand, the company did not as a general rule prescribe the routes which the drivers were to take. However it did employ a dispatcher and there was testimony of at least one instance in which this dispatcher "routed" a driver. The contract permitted the owner-operator to designate others to drive in his stead. There was evidence of only one instance in which this was done, and on that occasion the company's permission was sought and received. The evidence showed also that the type of work done by the owner-opera-

tor was a "one man job," there being no need for nor use of helpers. This evidence of the relationship of the company and its drivers in the actual conduct of the work illustrates the interest shown and the actual supervision exercised by the company in the details of the work as well as in the results.

█ Both the contracts made by the parties and the manner of carrying on operations by company and drivers support the conclusion that there was here an employer-employee relationship. We do not, of course, lay down any rule applicable to all "owner-operator" situations. Our conclusion is directed to the facts of this case.

Two cases relied on by respondent require mention. They are Harrison v. Greyvan Lines, Inc., 1947, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 and United States v. Mutual Trucking Co., 6 Cir., 1944, 141 F.2d 655. Both involved the question of whether truck drivers were "employees" for purposes of liability for social security taxes, and both held that the drivers there involved were independent contractors. Though the facts of the two cases are similar to those here they differ in several important respects. In the Greyvan case there was no such express reservation of control over the details of the work of hauling furniture, nor the actual exercise of control, as here. In addition the owner-operators there owned their own trucks and all equipment before they came to work for the company, and the work itself required the regular use of helpers who were hired, paid, directed and discharged by the owner-operator. These were the principal factors mentioned by the Supreme Court to accompany its statement that, "These driver-owners are small businessmen." 331 U.S. at page 719, 67 S.Ct. at page 1471. All are absent in the case at bar. Similarly, although it is perhaps a closer case, in the Mutual Trucking case it appears that the owner-operators were actually the owners of their tractors and trailers before they contracted with the company, retained almost complete dominion over them and they hired, paid and discharged their own drivers.

█ A word remains to be said about the alleged unfair labor practice in this case. In brief what happened was that some of the drivers were getting together to discuss the possibility of replacing the owner-operator system in respondent's Raritan terminal by a straight wage system. The owner-operator system was on a 4-month trial under the collective bargaining contract. During this trial period the drivers frequently discussed the merits of the system and the question whether to continue it. The Board found that respondent interfered with these discussions and possible atempts by the drivers to influence the Union not to renew the agreement or to modify it. It found also that driver Salinger was discharged because of his activities in this regard. These findings are supported by substantial evidence on the whole record. And we agree that such activity is protected by the Act. Attempts by some members of a union to bring about a change in the union's attitude about particular collective bargaining contracts is certainly "concerted activity" protected by Section 8(a) (1) of the Act. The employer cannot defend his interference by saying that the concerted activity was directed against the position taken by the union and not directly against the employer.[4]

The petition for enforcement will be granted.

4. Whether the discharge of Salinger amounts to a violation of Section 8(a) (3) as well we need not decide. The order of the Board may be sustained and enforced on the basis of the violation of Section 8(a) (1).