**The NEWS–JOURNAL COMPANY,**
**Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**No. 19252.**

United States Court of Appeals,
Third Circuit.

Argued June 10, 1971.

Decided July 12, 1971.

Arthur B. Hanson, Hanson, O'Brien, Birney & Stickle, Washington, D. C. (Ralph N. Albright, Jr., Washington, D. C., on the brief), for petitioner.

Ronald Tish, N. L. R. B. Washington, D. C., (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, William F. Wachter, Atty., N. L. R. B., on the brief), for respondent.

Before STALEY and ADAMS, Circuit Judges, and GARTH, District Judge.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The question in this case is whether the record before us clearly precludes the decision of the National Labor Relations Board that the truck-driver deliverymen of the News-Journal Company are employees rather than independent contractors.[1]

■ We approach the problem with the realization that we are not to function as a "judicial echo" for the conclusions of the NLRB,[2] and that "[w]heth-er on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the Courts of Appeals." However, we also recognize that the application of these principles does not "mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." [3]

This matter is here on the petition of the News-Journal Company to review and set aside an order of the NLRB and upon the petition of the NLRB to enforce its order.[4] The News-Journal publishes and delivers newspapers in and around Wilmington, Delaware. Some years ago, in order to improve the efficiency of its circulation department, it automated the mail room and terminated its contracts with the independent trucking companies that delivered the bundles of newspapers from the plant to the carriers and dealers. The laid-off mail room employees were offered the delivery routes and were given severance pay and an opportunity to finance their own trucks. Eventually, 21 persons, including some of the mail room employees, performed this service for the News-Journal.

■ From the beginning of this new arrangement, the News-Journal considered these men to be independent contractors. Each signed an explicit contract with the News-Journal.[5] Social Se-

---

1. "The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951).

2. *Id.*, at 491, 71 S.Ct. at 466.

3. *Id.*, at 488, 71 S.Ct. at 465, quoted in N.L.R.B. v. United Insurance Company, 390 U.S. 254, 260, 88 S.Ct. 988, 19 L.Ed. 2d 1083 (1968).

4. The decision and direction of election is reported at 180 N.L.R.B. No. 137 (1970); the bargaining order is reported at 185 N.L.R.B. No. 40 (1970).

5. At the time of the hearing, only 18 of the 21 contracts were produced. In the contract, the drivers were referred to as "contractors." Under its terms, a driver

curity and other taxes were not withheld from the amounts payable to them. They were free to use their trucks in any manner that did not interfere with the delivery of the papers.[6] Vacations, substitute drivers, and helpers were all matters left to their sole discretion. The record contains additional evidence which would tend to indicate that these men were in fact independent contractors.[7]

On the other hand, there is evidence in the record that these deliverymen enjoyed a somewhat different status. For example, despite the fact that the contract was ostensibly result-oriented, the News-Journal insisted that the drivers be present at the loading dock long before the papers were actually ready to be loaded. District managers frequently met with the drivers while they were en route in order to discuss matters with them. These officials performed checks to see that the papers were properly delivered, and ordered changes as they saw fit. On occasion, the company compelled the drivers to deliver additional items, such as "stakes and tubes" and "honor boxes."[8]

We recognize that the maintenance of an effective circulation department by a large newspaper requires precise adherence to, as well as frequent amendment of, the delivery schedule. Therefore, the fact that the delivery spots and number and contents of the bundles were changed often, and that opportunities for variation in the order of delivery, or the routes utilized were somewhat limited are, by themselves, important but not decisive. Similarly, the fact that the contracts were often amended orally, and with little or no notice, is also not determinative. What is critical is that the vast majority of the changes were made at the insistence of the News-Journal and that the company was the sole judge whether such changes merited corresponding adjustment in compensation.

In N. L. R. B. v. United Insurance Company, *supra*, the Supreme Court considered the congressional intent in excluding independent contractors from the coverage of the NLRA and concluded that "there is no doubt that we should apply the common law agency test here in distinguishing an employee from an independent contractor."[9] The Court, however, could not identify any one facet of the relationship as determinative, but rather stated:

"\* \* \* In such a situation as this, there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. What is important is that the total factual context is assessed in light of the pertinent common-law agency principles."[10]

It is unfortunate that in this case the NLRB expressed its conclusion in terms of a single test: whether "the

---

was obligated to deliver papers as designated from time to time by the company, to furnish and maintain his own equipment and to indemnify the company from any loss. The contract provided that its terms were suspended whenever publication of the papers was suspended. It further provided that it could be amended only in writing, and that it could be terminated on thirty days' notice by either party or without notice by the company in the event of breach by the driver.

6. At various times, drivers used their trucks on other jobs, such as collecting trash or delivering pastries. One driver even serviced a delivery route for a Philadelphia newspaper.

7. For example, there was no requirement that the trucks be painted in any uniform or distinctive manner. If a truck carried advertisements for the News-Journal, the driver received additional compensation.

8. "Stakes and tubes" are the devices to hold newspapers commonly seen along rural roads. "Honor boxes" are newspaper vending machines.

9. 390 U.S. at 256, 88 S.Ct. at 990.

10. *Id.*, at 258, 88 S.Ct. at 991.

News-Journal Company has in practice reserved to itself the right to control the basic manner and means, as well as the result, of the deliverers' work." [11] If we were convinced that the Board narrowly examined the record with only this in mind, we would be constrained to remand this matter for a proper consideration of the evidence. However, it is clear that the Board did consider the type of services rendered, the possibility of realizing additional profits through the exercise of entrepreneurial skill and the ownership and maintenance of the vehicles. In addition to examining the language of the contract, the Board weighed the practice of the parties, the skill required of the deliverymen, the mode of compensation for additional duties, and the methods of applying corrective and disciplinary measures. In light of this, we can say only that the NLRB chose between "two fairly conflicting views." [12] We cannot assert that they applied the wrong criteria.

The Court has carefully considered Meyer Dairy, Inc. v. N. L. R. B., 429 F.2d 697 (10th Cir. 1970), and Carnation Company v. N. L. R. B., 429 F.2d 1130 (9th Cir. 1970), and has found them inapposite. In those cases, the drivers primarily performed a retail sales function, and their status was more nearly analogous to that of franchisees. In such a situation where skill, independence, and personal judgment contribute heavily toward the success of the enterprise, the "right of control" test becomes more significant, since the actual or potential exercise of that control can stifle the entrepreneurial talents of the drivers.

In Herald Company v. N. L. R. B., 444 F.2d 430 (2d Cir., decided June 11, 1971), the Court examined a factual situation similar to those found in Meyer Dairy and Carnation, supra, and reached a contrary result. The Herald Company's distributors bought their papers wholesale and sold them retail, enjoyed a proprietary interest in their routes, and conducted many activities independent of or in competition with the Company. Nevertheless, the Court found substantial evidence that the Company maintained and exercised supervision over the performance of the distributors' duties, that the Company could control the value of the distributorships by threatening not to renew the contracts, and that the Company could regulate the distributors' immediate income by juggling wholesale prices and extracontractual payments.[13]

Here, the drivers perform primarily delivery functions, and do not resell the newspapers at a profit. What would be the manner of achieving the result in a context such as that found in Herald Company, supra, Meyer Dairy, supra, or Carnation, supra, is the sought-after result, itself, in this setting. Accordingly, these cases provide guidance but not governance.

The petition to review will be denied and the petition to enforce the bargaining order will be granted.

---

11. 180 N.L.R.B. at ——.

12. N.L.R.B. v. United Insurance Company, 390 U.S. at 260, 88 S.Ct. 988.

13. Although the Court quoted the N.L.R.B.'s interpretation of the Supreme Court's common law agency test from News Syndicate Company, Inc., 164 N.L.R.B. 423, 428 (1967) (right to control manner by which result is accomplished), it is clear that it did not restrict itself solely to the application of that criterion.