**AMERICAN CONSULTING CORPORATION**

v.

**UNITED STATES of America, Defendant-Appellant.**

**Nos. 19106, 19107.**

United States Court of Appeals, Third Circuit.

Argued April 1, 1971.

Decided Dec. 29, 1971.

---

Seitz, Chief Judge, concurred in the result.

Gordon S. Gilman, Tax Div., Dept. of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Bennet N. Hollander, Attys., Tax Div., Dept. of Justice, Richard L. Thornburgh, U. S. Atty., on the brief), for appellant.

James K. O'Malley, Morris, Safier & Teitelbaum, Pittsburgh, Pa. (Hubert I. Teitelbaum, Stephen J. Laidhold, Pittsburgh, Pa., on the brief), for appellee.

Before FORMAN, SEITZ and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

■ The single issue raised on this appeal is whether steel consultants with whom the American Consulting Corporation (hereafter American) contracted, constituted its employees or independent contractors under the Federal Insurance Contributions Act (hereafter FICA or the Act).[1] Though susceptible of simple statement, many complex elements enter into its resolution.

American was conceived by its president, Mr. Jack Coletti, who began to work for the United States Steel Company in the 1920's as a feeder, sticker, catcher and occasionally as an assistant roller, concededly not top jobs in the steel industry. When he was later disqualified on account of an eye disability, he sought employment overseas, but several attempts to obtain positions convinced him that his experience in the trade was limited and that it was necessary for him to hire qualified men to assist him in handling his job. Once while working in South Wales, he was asked to find workers to equip and operate a steel mill

1. 26 U.S.C. § 3101, et seq.

in Ennyville. Both for this and later for another plant in Wolverhampton, England, he managed to recruit the necessary personnel from among those who had been his superiors at United States Steel. For this service payment was made to Mr. Coletti from which he paid the workers and retained the balance. This form of compensation created the precedent for all future transactions in which workers were recruited through his services. Sensing the need of foreign steel plants for skilled workers, and his ability to meet their demands, he incorporated American under the laws of Pennsylvania in 1957 for that purpose.

From then on, Mr. Coletti contacted steel producers in countries such as Mexico, Sweden, Australia, Japan and India, and entered into contracts with them for the supply of skilled steel workers, or a team of them, in the particular areas of steel production where technical assistance was needed. Some of the workers were located by Mr. Coletti through his contacts in the steel industry. Others, who had heard of American by word of mouth or through newspaper advertisements, approached him for placement. Mr. Coletti then entered into a contract with each man for a position with a steel producer in the country where his individual skill was requested. These contracts ranged in duration from eighteen months to two years, and in several were renewed once or more following their termination. The consultants' services included participation in the construction and operation of hot and cold steel mills, and in technical instruction of foreign personnel in the methods of assembly and operation. The consultants so placed uniformly possessed technical skills considerably superior to Mr. Coletti's.

American paid FICA taxes for the consultants until 1959, when it was advised by a newly acquired accountant that they were independent contractors, not employees, whereupon it ceased payment.

In 1965, however, the Internal Revenue Service ruled that an employer-employee relationship did exist between American and the consultants, and in three assessments of April 2, 1965, June 25, 1965 and August 12, 1966, determined that $31,-589.27 in delinquent FICA taxes and $4,852.00 interest thereon were owing for the years 1961 through 1964.

On December 31, 1966, American paid FICA taxes under protest for one consultant, Joseph Keenan, in the sum of $348.00, and filed a claim for refund thereon. While this claim was pending, the Internal Revenue Service, on February 1, 1967, served a notice of levy upon American's bank in Pittsburgh, and seized $8,224.46 thereunder, which was applied to the alleged deficiency for the period of January 1, 1961 through December 31, 1962. American's claim for refund of the $348.00 paid on behalf of Joseph Keenan was disallowed on April 17, 1967 and a suit for its refund was thereafter brought on April 27, 1967 in the United States District Court for the Western District of Pennsylvania. The Government filed a counterclaim several months later, crediting American with the $348.00 paid and the $8,224.46 seized, and demanding judgment for $27,868.81 plus interest.

American then filed a claim for refund of the seized $8,224.46, and following its disallowance on August 1, 1968, instituted a second suit for refund on August 26, 1968. The two actions were consolidated and tried to the court without a jury. In an opinion and order of April 15, 1970, the District Judge held that American's consultants were independent contractors and not employees, and entered judgment in favor of American in the sum of $8,-572.46 with interest.[2]

Resolution of the present issue turns upon a determination of the consultants' legal status under § 3121(d)(2) of the Act, which defines an employee as:

"any individual who, under the usual common law rules applicable in deter-

2. The opinion of the District Court appears at 311 F.Supp. 715.

mining the employer-employee relationship, has the status of an employee."

This provision was enacted in the 1950 amendments to the Act, following the Supreme Court's decisions in United States v. Silk,[3] and Bartels v. Birmingham.[4] In those cases the Court attempted to resolve inconsistencies in the decisions of lower courts as to which criteria prevailed in distinguishing between employees and independent contractors. The Court in *Silk* enunciated a factual standard designed to take account of economic realities and the "declared policy and purposes of the Act. . . . "[5] In so doing, it recognized that the right to control is "a factor in the determination of whether the worker is an employee or independent contractor,"[6] but rejected the power of control test, which has been popular with lower courts,[7] as the sole determinant of the issue. This reasoning was repeated in *Bartels,* in which the Court stated:

> "In United States v. Silk, *supra,* we held that the relationship of employer-employee . . . was not to be determined solely by the idea of control which an alleged employer may or could exercise over the details of the service rendered to his business by the worker or workers. Obviously control is characteristically associated with the employer-employee relationship, but in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service. In *Silk,* we pointed out that permanency of the relation, the skill required, the investment in the facilities for work, and opportunities for profit or loss from the activities were also factors that should enter into judicial determination as to the coverage of the Social Security Act. *It is the total situation that controls."* [8] (Emphasis supplied).

Shortly after these decisions, Congress enacted the so-called "Status Quo" Resolution, which was later embodied in § 3121(d)(2). It is clear both from the Resolution and the addition of § 3121(d)(2) to the Act that Congress intended to reassert the validity of traditional common law principles in opposition to a new economic reality test. From a reading of the two cases, however, it appears that although the Court rejected the power of control test as the governing criterion in distinguishing between employees and independent contractors, it did not manifest an intent to abrogate the common law standards by which this issue had been previously resolved. Rather, the Court demonstrated a shift in focus toward a factually oriented approach involving an examination of all of the elements in the employment relationship, which in totality would realistically illuminate its nature.[9]

This court has in the past invoked principles grounded in both economic realities and the common law,[10] and concluded that:

> "at least insofar as this Circuit is concerned . . . the employee vers-

3. 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947).

4. 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947).

5. 331 U.S. at 713, 67 S.Ct. at 1468.

6. 331 U.S. at 714, 67 S.Ct. at 1469.

7 See Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717 (2nd Cir. 1943) ; Jones v. Goodson, 121 F.2d 176, 179 (10th Cir. 1941) ; Magruder v. Yellow Cab Co. of D. C., Inc., 141 F.2d 324, 325 (4th Cir. 1944).

8. 332 U.S. at 130, 67 S.Ct. at 1549.

9. For a full discussion of the history of *Silk, Bartels,* and the Status Quo Resolution see 33 Temp.L.Q. 273, 381 (1960), and United States v. W. M. Webb, Inc., 397 U.S. 179, 90 S.Ct. 850, 25 L.Ed.2d 207 (1970).

10. Compare Schwing v. United States, 165 F.2d 518 (3rd Cir. 1948) and Farming, Inc. v. Manning, 219 F.2d 779 (3rd Cir. 1955) with N. L. R. B. v. Nu-Car Carriers, Inc., 189 F.2d 756 (3rd Cir. 1951), cert. den., 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952) and N. L. R. B. v. Keystone Floors, Inc., 306 F.2d 560 (3rd Cir. 1962).

us independent contractor issue under the [National Labor Relations] Act is to be determined by the application of common law principles of agency." [11]

■ This conclusion is equally applicable to the present controversy under the Federal Insurance Contributions Act. In the application of the common law principles the "right to control" test remains an important index of the relationship, but no one factor is controlling.[12] All of the elements involved in the employment must be balanced in terms of their significance within the entire employment relationship. In the present case, this court is also bound to affirm the District Judge's findings of fact unless they are clearly erroneous under Rule 52(a) of the Federal Rules of Civil Procedure.

The Government contends that an employer-employee relationship existed under the common law guidelines on the basis that: (1) American had the power to transfer the consultants from place to place, and to discharge them at will for improper conduct or incompetence; (2) the consultants were subject to instructions and directions from American in the manner of performance of their work; (3) some consultants considered Mr. Coletti their "boss"; (4) the contracts between American and the consultants stipulated that they refer to themselves as employees except in legal and tax matters; (5) a permanent and continuing relationship existed between American and the consultants; (6) the consultants were paid on a time rather than a lump sum basis; (7) American provided paid vacations, medical treatment, travel expenses, housing and taxes overseas; (8) the consultants neither advertised nor held themselves out to the public as such; and (9) they could not hire their own helpers or work for anyone else while they were under contract with American.

---

11. Steel City Transport, Inc. v. N. L. R. B., 389 F.2d 735, 737 (3rd Cir. 1968). See United States v. W. M. Webb, Inc., 397 U.S. 179, 188, 192, 90 S.Ct. 850, 25 L. Ed.2d 207 (1970), in which the Supreme Court, although dealing with a question in admiralty, has provided some indication of its reaffirmation of traditional common law principles as a standard in this area.

12. As set out in Treasury Regulation 31.-3121(d)–1(c), they are:

"(c) *Common law employees.* (1) Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.

"(2) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules. Individuals such as physicians, lawyers, dentists, veterinarians, construction contractors, public stenographers, and auctioneers, engaged in the pursuit of an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees.

"(3) Whether the relationship of employer and employee exists under the usual common law rules will in doubtful cases be determined upon an examination of the particular facts of each case."

See also Restatement (Second) of Agency § 220. (1957).

If actually present, these factors would go far to support the contention that the consultants were employees. The Government's characterization of the relationship, however, relies heavily on provisions in the consultants' contracts.[13] But they are not the determinants of the relationship which actually existed,[14] and a substantially different relationship emerges from an examination of all of the evidence including the contracts between American and the foreign steel companies.

Turning briefly to one such contract, American in 1961 agreed to furnish a team of consultants to Hindustan Steel, Ltd., an Indian steel plant, for two years.[15] American reserved an option to place more men on the job when it felt production would benefit thereby, and agreed to replace any consultant who proved incompetent or undesirable to Hindustan. Contract renewals were to be made through American, and not directly with the consultants.[16] American's contractual obligation was limited to the furnishing of a qualified team. It was not to be responsible for any damage caused by the consultants, but they were to be responsible to Hindustan for damage caused by gross negligence.[17]

Hindustan agreed to pay a lump sum of $500,000 in dollars and $170,000 in rupees for the consultants' services. The first sum was to be deposited in monthly installments to American's account in Pittsburgh, and the second to American's account in India.[18] American's compensation consisted of the difference between the lump sum payment from Hindustan and the amounts the consultants contracted to accept.

Hindustan assumed the responsibility for the consultants' round trip transportation, overseas and within India, by sea, air or rail; for all costs incidental to travel, such as passports, visas, inoculations and freight;[19] for drinking water, telephones,[20] taxes levied by the Indian government,[21] medical treatment, hospitalization,[22] vacations,[23] insurance for accident or death,[24] and the return of remains to the United States.[25]

It is apparent at the outset that many of the costs which the Government alleges were paid by American were in fact assumed by Hindustan. The consultants were aware that Hindustan and the other steel plants paid for these expenses. In the few cases where they did not, the consultants themselves, and not American, undertook to pay for them. Three consultants, John Kois, Herman Lang, and Joseph Keenan stated that Hindustan paid for their traveling expenses. A fourth, William Stamper, received airline tickets from an Air-India office in New York but was uncertain who paid for them. Two consultants, Mr. Kois and Harry W. Lonkowske, also received automobiles for travel within the nations where they were located.

Hindustan paid for Mr. Kois' passport, while Mr. Stamper and Clyde Call paid

13. A copy of a specimen contract appears in Appendix A. following this opinion. One additional individual contract, executed with Joseph Keenan, appears in the record. It does not, however, contain provisions which affect the disposition of this case.

14. See Hoosier Home Improvement Co., Inc. v. United States, 350 F.2d 640, 643–644 (7th Cir. 1965).

15. The pertinent provisions of this contract are contained in Appendix B, following this opinion. Although it is the only contract with a foreign steel manufacturer provided in the record, there has been no evidence to indicate that the Hindustan contract is not typical of the others entered into by American with foreign steel companies.

16. App. B, p. i, Art. 1.

17. App. B, pp. vi, vii, Art. 10.

18. App. B, pp. iii, iv, Art. 4.

19. App. B, pp. iv, v, Art. 5.

20. App. B, p. v, Art. 6.

21. App. B, pp. v, vi, Art. 7.

22. App. B, p. vi, Art. 8.

23. App. B, p. vi, Art. 9.

24. App. B, p. vii, Art. 11.

25. App. B, p. v, Art. 5.

for their own. Mr. Lonkowske was reimbursed for this and other incidental costs by American, but was unsure of the true source of the money.

Although they did not indicate the source of the payments, Messrs. Kois, Keenan and Lonkowske continued to receive compensation during sickness and vacations as provided in the American-Hindustan contract. Hospitalization for Mr. Call was paid by the plant where he was located.

The Government's assertion that American bore virtually all incidental costs must fail in light of the testimony regarding the above details viewed in the whole, notwithstanding that, in one instance, American did pay for the transportation of Mr. Keenan's personal effects to India.

With respect to housing, Hindustan agreed to supply the consultants with furnished bungalows at a rental applicable to employees.[26] The contracts between American and the consultants disclose that in most cases the consultants, and in a few American, would pay for rent. Mr. Coletti testified that the consultants who worked in the hot mill insisted that Hindustan pay for their housing, and that it was paid in rupees from Hindustan's deposits to American's account in India.[27] One consultant, Mr. Lang, testified that Hindustan paid his rent and that he paid for utilities. Two others, Messrs. Keenan and Kois, stated that they paid for their apartments. On the whole, the evidence does not support a finding that the cost of housing was assumed by American.

As another indication of the existence of an employer-employee relationship between American and the consultants, the Government contends that payment for their services was on a time basis rather than by a lump sum distributed in monthly installments. The record discloses that in negotiations with Hindustan, American first determined the payment Hindu-

stan would make over the complete period during which the consultants' work was to be performed, and then negotiated with the individual consultants the compensation within the aggregate amount in its contract. In dealing with Japanese plants Mr. Coletti first determined the range of compensation acceptable to the consultants for their services and then calculated the cost of the contracts with the Japanese firms. From the beginning the consultants' agreements contemplated payment for the complete duration of their work overseas.

American distributed the consultants' compensation immediately upon receiving the monthly installment of the lump sum payment from the foreign steel companies. The payment proceeded in chain-like fashion to the consultants.

The Government's further argument that the fees constituted a salary because American distributed them is not persuasive in the circumstances of this case. As mentioned previously, American's custom of disbursing consultants' compensation originated with Mr. Coletti's early experience in England, and does not of itself show that the consultants received a salary rather than a lump sum payment. In light of the circumstances which prevailed where the consultants were located at great distances from the United States, Mr. Coletti's testimony is persuasive that American merely accommodated the consultants in their requests that it deposit part of their payment in their respective banks in the United States and distribute part to them on location. American's action in this respect does not rise to a significant indication of an employer-employee relationship. Hence, the evidence on the whole supports the District Judge's finding that the compensation agreed upon by the consultants contemplated the entire period of their services abroad, and was paid in monthly installments.

---

26. App. B, p. v, Art. 6.

27. At trial, Mr. Coletti was permitted to testify that Hindustan did cover the cost of housing, contrary to the provision for

rental in the American-Hindustan contract, which was inserted to avoid dissatisfaction among German personnel from whom rent was required.

The Government's assertions that the consultants generally did not hold themselves out to the public as such, could not work for others while under contract with American, and that two or three considered Mr. Coletti their "boss" are indeed borne out by the record. Yet the significance of the failure to advertise publicly is neutralized by evidence that the highly specialized market was very small and that it was customary for the parties to establish contact largely by means of reputation and word of mouth.

That the consultants could not contemporaneously offer themselves to work for others was inherent in the very nature of their commitments, which contemplated full dedication to their several specialized tasks. In fact, these circumstances were such that the notion of making themselves available for other time-taking projects could not be drawn into issue.

■ While the belief and intentions of the parties as to their status are relevant considerations, they are not determinative of the issue.[28] The record in fact disclosed contradictory testimony on this point.

In addition, the provision in the American-consultant contracts stating that the consultants were to refer to themselves as employees except in legal and tax matters,[29] and emphatically stressed by the Government, does not carry the conviction of employee characterization it seeks to achieve. Apart from the obvious ambiguity in the language of the provision itself, the record leaves the intent of the parties obscure. Nothing dilutes Mr. Coletti's testimony that the consultants were well aware that it was inserted only for purposes of "public relations" to enhance American's reputation as a supplier of specialists. Nor do several instances of contract renewals ranging generally from one to two years which the Government emphasizes support its contention that the District Judge committed clear error in finding that no permanent relationship existed between the parties. Unquestionably the Government has brought forward a number of factors which on their face appear characteristic of an employment relationship. But they do not mechanically compel the conclusion that the consultants were employees in the light of the record which, when closely scrutinized, reveals a substantial number of elements to the contrary.

American's lack of a right to control or supervise the consultants' performance in any substantial aspect is manifest in the record. All of the consultants' day-to-day work was done under the control and supervision of the management of each of the foreign steel plants. It determined working hours and days, the location on which the work was to be done, and vacation schedules. It supplied all of the tools, equipment, and materials necessary for performance, as well as automobiles, gas, and drivers for the temporary transfer of men from one location to another within foreign nations. In addition, the foreign steel plants provided all assistants and helpers necessary for the consultants in their work. The Government emphasizes the fact that the consultants on the whole could not hire assistants. In the context of these circumstances, however, where it was contemplated that workers would be supplied by the foreign plants,[30] the failure of the consultants to hire helpers is not significant in construing the relationship between American and the consultants.

American, furthermore, did not have the right to instruct or direct the consultants in any way regarding the manner or means of their performance. The record discloses that Mr. Coletti visited foreign plants in order to stimulate new contacts and renew contracts with them, not to instruct or direct the consultants, as the Government contends. The consultants testified consistently that they did not receive instructions from Mr. Coletti, although he did on a few occasions send suggestions to consultants

28. Youngken v. United States, 407 F.2d 836 (3rd Cir. 1969).

29. App. A, p. i.

30. See App. B, p. ii, Art. 2(a) and (b).

when they encountered difficulty in the mills.[30a] The consultants considered it advice which they were free to accept or reject. Mr. James Cassini, for example, testified that after receiving a suggestion from Mr. Coletti concerning the technical instruction of Hindustan's personnel, he continued to follow his own judgment in teaching methods. In another case, Mr. Kois testified that after his transfer to Australia, Mr. Coletti asked him to persuade the Australian plant to invite him for a visit. The fact alone that Mr. Coletti had to turn to Mr. Kois to help him obtain access to the plant demonstrates how little control American had over Mr. Kois. Ironically, Mr. Kois was not successful in his attempt to persuade the Australian firm and Mr. Coletti never made the visit.

The Government's reliance on Schwing v. United States,[31] in which tailors who did piecework for a retailer of men's clothing were held to be employees, is misplaced. The employer in *Schwing* retained some control by supervising the quality of the work and assuming the responsibility to correct defective tailoring. American, on the other hand, was distinctly exempt from any responsibility for defective work of the consultants.[32] In addition, the court expressly rejected any reliance on the common law rules of agency which subsequently have been accepted as the controlling standard for the resolution of conflicts in this area.

The record conclusively supports American's assertion that it had no right to control either the method and means or the times and location of the consultants' performance. While the Government correctly asserts that the extent of the right to control must be examined in light of the degree of control required by the particular area of work,[33] not even the right to a bare minimum of control over the consultants' work has been demonstrated here.

American's lack of a right to control over the consultants is further demonstrated by its inability to effect transfers without their consent and the consent of the foreign plants, notwithstanding a "transfer" provision in the consultants' contracts.[34] For example, Mr. Call initially approached Mr. Coletti for a position in Sweden. Mr. Coletti had an opening only in India, which he refused. In another case, Mr. Kois was working in Japan, and Mr. Coletti asked him to transfer to another city. He declined. After Mr. Kois had worked in Japan for a year, American suggested that he transfer to India for the remainder of his two-year contract, but Mr. Kois instead accepted a position in Australia which he preferred. He transferred at the request of the Australian plant and not by American's order, as the Government has suggested. Moreover, its argument that American's right to control transfers was demonstrated by an instruction to Mr. Kois to travel to Australia by plane despite his desire to go by boat is not persuasive. Mr. Kois could not have reached Australia at the stipulated time if he had taken a ship. Having agreed to placement in Australia on a certain date, it was not a significant measure of the legal relationship for Mr. Coletti to encourage him to use the means of transportation which would get him there on time. Again, Mr. Lang returned to the United States without the knowledge or permission of American, and Mr. Lonkowske was moved from one city to another by Hindustan, without permission from American.

---

30a. Mr. Coletti also requested progress reports from some of the consultants. Often they were not sent, with no resulting consequence.

31. 165 F.2d 518 (3rd Cir. 1948).

32. See App. B, p. vii, Art. 10.

33. The Government cited United States v. W. M. Webb, Inc., 397 U.S. 179, 90 S.Ct.

850, 25 L.Ed.2d 207 (1970); Deecy Products Co. v. Welch, 124 F.2d 592 (1st Cir. 1941) and McGuire v. United States, 349 F.2d 644 (9th Cir. 1965). But the factual patterns in each differ from the instant case.

34. See App. A, p. i, ¶ 4.

While American's contracts with the consultants did contain a provision for their transfer, the testimony on the whole indicates that in actual practice the consultants were free both to initially select the location of their choice, and to refuse transfers by American.

Finally, American's lack of a right to control over the consultants is shown by its inability to discharge them without the consent of foreign plants. American did attempt to remove a few consultants after receiving reports that they were not performing competently or were causing difficulties among the consultants, but could not because the foreign plants were opposed. In one instance Mr. Coletti attempted to discharge Mr. Keenan, but failed because Hindustan's management was satisfied with his work. In another case, Mr. Coletti attempted to remove Mr. Cassini when he was reported to both American and Hindustan to have been responsible for mill breakage. Hindustan acquiesced initially, but later determined that another consultant was actually responsible for the damage, and removed him to a different position, while Mr. Cassini was reinstated. American's inability to discharge consultants is also supported by the testimony of Messrs. Kois, Call and Lonkowske, who stated that any complaints had to be directed to the management of the foreign plant, and that it alone had the power to remove a consultant. The Government's emphasis on one instance in which Mr. Lonkowske attempted to suspend and to refuse advance compensation to a consultant, Mr. Richard Altmeyer, after discovering that he would not work and was preparing to leave India is not persuasive of American's right to discharge since Mr. Coletti asked him to remain and he eventually left of his own volition.

American was not only powerless to discharge consultants but likewise could not order a consultant to remain if the management of a foreign plant rejected him. Thus, Mr. Cassini was requested by American to return to India after a month's vacation in the United States. Two days before he was to leave, Hindustan sent Mr. Coletti a cablegram stating that he should not return. Mr. Coletti so informed Mr. Cassini and he remained in the United States.

On the basis of a full review, the record discloses that American's contractual authorization to discharge consultants was illusory. In actual practice American could not discharge a consultant whose services were satisfactory to a foreign plant, but was bound to remove him upon the representation by the foreign plant that his services were unsatisfactory and replace him, if so requested.[35]

The conclusion is compelled that American possessed no significant right to control the consultants once they were placed with an overseas steel manufacturer, and that American's business was simply to furnish skilled steel workers to plants which had requested them. At the times Mr. Coletti visited foreign steel plants his contacts with the consultants were on the whole casual.

Viewed in the context of the entire relationship, American's activities abroad and interest in the consultants' performance reflect and are consonant only with a desire to achieve and maintain a reputation as a supplier of skilled steel workers. This function was distinct from that of the consultants, whose services were performed for the benefit of the foreign steel plants and not American.

Far from being similar to the operation of a firm referred to as "Koppers" at trial, as argued by the Government, American's function was in decided contrast thereto. Koppers was an American concern which built and thereafter managed and operated a steel plant in Turkey. Its workers, some of whom were Americans, were considered its employees. In the present case, on the contrary, American simply furnished skilled

---

35. In its contracts with the consultants, American was also authorized to discharge them if they or their families conducted themselves to the detriment of American's reputation (see App. A, p. ii, ¶ 5). This is not determinative of an employer-employee relationship since it could equally apply to an independent contractor.

advisers. The building and operation of the steel plants were directed and managed by the foreign firms.

Although this court has not previously considered a case involving the factual circumstances present here, substantially more control was found in those cases where an employment relationship was determined to exist.[36]

The present case is most similar to Saiki v. United States,[37] in which experts in the determination of the sex of newly-hatched chicks were held to be independent contractors of the corporation which engaged them. The business of the corporation was to supply trained chick sexers to hatcheries in fourteen states. It advertised its business and executed contracts with hatcheries for the furnishing of the sexers. It then entered into contracts with individuals, who were trained by it, assigning them to different areas. The work was performed without any supervision from the corporation, although the most senior worker in an area acted as an area "supervisor." Each worker supplied his own tools. The contracts between the corporation and the chick sexers provided that the corporation could instruct and direct them, and that they could not work for any other concern while under contract. Although it was provided that the workers were responsible to the corporation for faulty performance, actually they adjusted mistakes directly with the hatcheries in most cases. The workers' compensation, which was on a commission basis, was paid by the hatcheries, and the corporation received a percentage of it. It was sometimes collected from the hatcheries and distributed by the area supervisor, and at other times collected by the workers themselves. The court distinguished between the business of the corporation, which it held was to supply chick sexers, and the function of determining sex performed by the workers. On the basis of all of these circumstances, it found insufficient control exercised over the sexers to establish them as employees stating that:

> " "* * * the courts have repeatedly held that an employer has a right to exercise such control over an independent contractor as is necessary to

---

36. In News-Journal Company v. N. L. R. B., 447 F.2d 65 (3rd Cir. 1971), truck-driver deliverymen were held to be employees of a newspaper company, despite the presence of factors tending to show an independent contractor relationship, where contraindications disclosed that the newspaper determined the time at which the drivers were to appear at the loading dock, district managers met with the drivers and discussed matters en route, checked their performance and ordered changes as they saw fit, and at times compelled the drivers to deliver additional items.

In Steel City Transport, Inc. v. N. L. R. B., 389 F.2d 735 (3rd Cir. 1968), truck drivers were held to be employees of a motor common carrier on the grounds that it maintained possession and control of all equipment leased from it by the drivers and its name appeared on all equipment; that it assigned all loads for dispatch and required drivers to call in if they could not work on a specific day; and that it unilaterally cut the drivers' compensation, and prohibited the drivers from using the equipment for other carriers without its prior consent.

In N. L. R. B. v. Keystone Floors, Inc., 306 F.2d 560 (3rd Cir. 1962), salesmen whose agreements with a corporation provided that they were independent agents and not employees were held to be employees, on the grounds, among others, that the corporation trained the salesmen, notified them of "leads" weekly, which they were required to follow up, fixed selling prices, approved all sales before they could become final, and unilaterally changed the rate and method of the salesmen's compensation.

In N. L. R. B. v. Nu-Car Carriers, Inc., 189 F.2d 756 (3rd Cir. 1951), cert. den., 342 U.S. 919, 72 S.Ct. 367, 96 L. Ed. 687 (1952), workers who leased tractors from a corporation were held to be employees, on the grounds that express contractual provisions placing the workers under the direction and supervision of the corporation were enforced by supervisors who checked up on the quality of their driving, discharged, and at times assigned routes to the workers. There was evidence that the drivers needed the corporation's permission to designate others in their stead. In addition, they received a salary, and were required to park overnight on the corporation's lot.

37. 306 F.2d 642 (8th Cir. 1962).

secure the performance of the contract according to its terms, in order to accomplish the results contemplated by the parties in making the contract, without thereby creating such contractor an employee.' " [38]

We think that this reasoning is equally applicable to the present case. Similarly, American was simply a specialized employment agency engaged in placing consultants in foreign service.[39]

The Government's contention that an employer-employee relationship existed fails and the conclusion of the District Court is supported by the record as a whole. Hence its judgment and order of April 15, 1970 is affirmed.

Chief Judge SEITZ concurs in the result because the clearly erroneous standard of review is applicable. However, given the unusual factual situation and the objectives of the Act, had he been the trial judge, he would have reached a contrary result.

## APPENDIX A

### CONSULTING AGREEMENT
between
AMERICAN CONSULTING
CORPORATION,
CLAIRTON, PA. U.S.A.
and
MR. HERMAN W. LANG, 542 SPRINGDALE DRIVE, PITTSBURGH 35,
PENNA. U.S.A.

American Consulting Corporation, Clairton, Pa., hereby agrees to retain, as Consultant on problems of:

### COILER OPERATION AND GENERAL PRACTICE
the services of Mr. Herman W. Lang hereafter referred to as Consultant for a period of TWO YEARS Starting June 1, 1961. Mr. HERMAN W. LANG, agrees to become an independent Consultant to, and not as an employee of, American Consulting Corporation but shall, however, always refer to himself in all matters excepting legal matters or matters pertaining to tax purposes, as an employee.

### TERMS OF AGREEMENT

1. The Consultant will hereby agree to accept full responsibility for all taxes for which he is liable in the United States of America, and its possessions, and will also be responsible in the entirety for all sickness, or accidents or any legal difficulties that may arise from any reason, or cause, either in this country, or abroad, to himself or his family from the time this agreement is signed until he terminates his services as Consultant to the American Consulting Corporation.

2. American Consulting Corporation, will be only responsible for payment of the monthly fee, agreed on by the Consultant and American Consulting Corporation, and for the payment of taxes that may be due to any foreign government, plus the cost of air travel to the plant or country to which the Consultant may be sent, and the return trip to his home, for himself and his family. In the event of further assignments, American Consulting Corporation reserves the right to send the Consultant and his family directly to the new assignment instead of to his home in the States. Provision for the travel of the Consultant's family

---

38. 306 F.2d at 651–652.

39. As in our recent case of News-Journal Company v. N. L. R. B., 447 F.2d 65 (3rd Cir. 1971), in which this court, under the doctrine of Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), found sufficient support to affirm a decision of the N L. R. B. that newspaper deliverymen were employees rather than independent contractors in the presence of conflicting evidence, we, too, are obligated to respect the decision of the District Court herein on the facts. Fed.R.C.P. 52(a). The difference in the factual patterns of the two cases accounts for the disparity in result. See note 36, *supra*.

shall be made only on long term contracts of more than six months.

3. In case of a long term contract, of a year or more, the American Consulting Corporation shall agree that the Consultant shall be given THREE WEEKS paid vacation with full payment of fees agreed on. This vacation shall not be taken at times when the conditions at the plant to which the Consultant is assigned permit his leaving with no interruption in the training program.

4. The Consultant shall agree to render his services in any plant to which he shall be assigned by the American Consulting Corporation, and shall remain there until sent elsewhere, or his contract is terminated.

5. American Consulting Corporation, retains the right to terminate this agreement and to dismiss the Consultant with no further payment or fees, if his conduct or the conduct of his family, is detrimental to the reputation of American Consulting Corporation, or also if the Consultant proves to be incompetent and unable to perform his duties to the satisfaction of the American Consulting Corporation, or the client to which he has been assigned.

6. American Consulting Corporation agrees to pay the Consultant, Mr. HERMAN W. LANG a fee equal to the amount of U.S. Dollars $1700.00 per month, for the period of TWO YEARS, said payments to be made as follows:

    a. Paid in U.S. Dollars to a bank of the Consultant's choosing, in the United States, per month at the end of each month . . . $1200.00.

    b. Paid in the currency of the country in which the Consulting service shall be performed, in advance of each month, the sum of equal to U.S. Dollars . . .

$500.00. At the start of each new assignment, American Consulting Corporation reserves the right to make this payment for the first month, after the payment of local currency has been made by the clients to whom the Consultant has been assigned.

7. A furnished apartment will be supplied by the American Consulting Corporation, the cost of which will be paid by CONSULTANT HIMSELF. The utilities shall be paid out of his living expense regardless who pays for the apartment.

8. This contract will become valid only if approved by the BOTH PARTIES.

We, the undersigned, do hereby agree to the terms of this contract, and shall agree to perform the duties or obligations hereby listed for both parties.

(Signed)

JACK COLETTI, PRESIDENT
AMERICAN CONSULTING CORPORATION.

APPENDIX B

CONTRACT

made between

Messrs. Hindustan Steel Limited, Rourkela

hereinafter referred to as "COMPANY"

and

The American Consulting Corporation Clairton, Pa., U.S.A.,

hereinafter referred to as "CONSULTANTS"

represented by Mr. J. Coletti,

for furnishing a team to assist the Company in supervising and to train Indian personnel in the operation of the Semi-Continuous Hot Strip Mill at Rourkela (Orissa/India).

The team shall comprise of

10 Hot Mill Operators to supervise operations on Roughing Mills, Finishing Mills, Speed Pulpits, Coilers, and shall also include competent Rolling

Mill men who shall act as Superintendent, Assistant Superintendent and General Foreman. One of these men should be used to co-ordinate Hot and Cold Rolling Mill Co-ordination.

## ARTICLE 1.

*Period of Activity:*

The duration of the period of activity of the team shall be based on two years, or a total of 240 man months, starting from 6 days before arrival in India and ending 6 days after leaving India for their homes. Date of starting of Contract shall be 1st June, 1961. Day of arrival in India shall be June 7, 1961, and day of departure shall be 6 days before the term of service for each man is terminated.

In the event Consultants feel it will benefit the Company, Consultants will try to extend the services of some of the key men and compensate by shortening the term of services of some other men, to maintain the 240 man-months overall average which is stipulated in the Contract. Consultants shall only do this if it is possible to place the man to be removed, on other work, similar in character and with equal benefits and fees, with another Firm.

In the event that all 240 man-months have been used up by June 1963, and Company still wishes to extend the services of some of the personnel, this contract will be suitably extended on the same terms according to the number of men requested by mutual agreement. It is agreed that services of any of the staff will only be renewed through Consultants and the Company will not negotiate, or make an agreement directly with any of the staff.

In order to try to ensure good operation at all times, Consultants reserve the option to place more than 10 men on the job when Consultants feel it will benefit production. In that event Consultants shall adjust the terms of services of the men to maintain the 240 man-months average over-all.

If any man proves to be incompetent or undesirable, Consultants shall either replace this man with a competent man at their own expense or shall have the option of transferring the work-months due to this man, to other men, in order to keep the 240 man-months.

At the end of 15 months from starting date the Company and Consultants shall control at a meeting the total number of man-months used to-date and shall decide what adjustments of man-months shall be made in the next 9 months.

## ARTICLE 2.

*Services and Work to be performed:*

To enable the Consultants to perform their duties satisfactorily, the Company shall maintain the Semi-Continuous Hot Strip Mill and shall provide all pre-requisites necessary to ensure that the assistance provided by the Team in the Operation of the said Rolling Mills can be rendered without interference. The following are included in the pre-requisites, but the list is not comprehensive:

a) A thoroughly trained Mill crew well versed in the work and trained mechanics,

b) Reliable personnel for the operation of the electrical and mechanical equipment in accordance with the characteristics of the mechanical equipment and the rolling process used;

c) Provision of raw, auxiliary and operating material required for operation of Plant or in connection therewith;

d) Elimination of all difficulties reported to the Company by the leader or any other member of the team.

After M/s. Demag, Duisburg, Contractors for the supply, erection and commissioning of the Hot Strip Mill have demonstrated the satisfactory working of the said Plant and the guaranteed output as provided in their contract with the Company, Consultants will during the period of their contract with the

Company, maintain a steady and average (quarterly) production of strips consistent with the nature and sizes of finished strips planned by Company, subject to adequate supply of slabs of the required quality and dimensions and prompt supply of required stores, materials, spares and also satisfactory maintenance of electrical and mechanical equipment for which the Company shall be responsible.

## ARTICLE 3.

A) *Working Time:*

The normal working activity of the team shall cover a 48 hour week, based on 8 hours daily.

B) *Interruption of work:*

If the work of the team furnished by the Consultants is interrupted for reasons for which they cannot be held responsible, the Company shall still pay the amounts listed in Article 4.

During such period the Consultants' personnel will give training to the Indian personnel.

## ARTICLE 4.

Company will pay to the Consultants for the services of the members of their staff a lump sum of—

1) 500,000 U. S. Dollars net after payment of all taxes, fees, and levies which may be levied on the Consultants and/or their staff members by the Indian Government, State Local or any other Indian Authority;

2) 170,000 U.S. Dollars net to be paid in Rupees after payment of all Indian Taxes, fees, and levies which may be levied on the Consultants and/or their staff members by an Indian Government, State, Local or any other Indian Authority.

The above payment shall be free from Indian Income Tax payable, if any.

For the above mentioned Dollars lump sum payment of 500,000 U.S. Dollars, Company shall open, not later than 7th March 1961 an Irrevocable Letter of Credit in favour of the American Consulting Corporation, which shall be unconditionally confirmed by the First National Bank of Clairton, P.A., U.S.A.

The above-mentioned Letter of Credit will establish the following mode of payment:

15% to be paid on signing of the contract against a Bank Guarantee acceptable to the Company and the balance 85% to be paid in 24 equal monthly installments in advance commencing from 1st June 1961 subject to adjustments depending upon the actual number of man-months as worked after making the first 15 payments.

For the above-mentioned Rupee lump sum payment equal to 170,000 U.S. Dollars, Company shall open, not later than 7th March, 1961, an irrevocable Letter of Credit in favour of the American Consulting Corporation which shall be unconditionally confirmed by the State Bank of India.

The Rupee portion shall be paid in equal monthly installments in advance commencing from 1st June 1961 subject to adjustment, depending upon the actual number of man-months worked, at the end of 15 months.

Both payments shall be deemed to be effected when the sums are credited to the respective Bank Accounts of the Consultants in the First National Bank of Clairton, P.A., U.S.A. for dollar payments and in the State Bank of India, Calcutta for rupee payments.

All monthly payments shall be against ordinary receipt, and the payments shall be made automatically in advance of each month, with no order necessary from Company subject to necessary adjustments depending upon the actual number of man-months worked on completion of 15 months. This applies to both Rupee and Dollar payments.

## ARTICLE 5

*Travelling:*

Company will pay to the Consultants all travelling costs by rail, air or sea. If the travel is by Air, passage will be

arranged through Air India International.

For travel by rail and sea, the Consultants will arrange the passage and present the Bill to Company for payment in U.S. Dollars or Indian Rupees as the case may be.

The travelling cost shall be based on the following class of travel:

1) *Air or Sea Passage:* First Class for members and their families at current air line or marine line conditions;

2) *Rail travel on U.S. Railways:* First Class

*Rail travel on Indian Railways:* Air-conditioned Class

Company shall also pay to the Consultants on signing the contract a lump sum amount of 7,000 U.S. Dollars to cover all costs arising from or in connection with the following which covers both inward and return journey:

Visa, Passport, medical examination, vaccination, innoculating, freight charges for personal effects including insurance, customs duty, excess baggage and tropical outfit, etc.

In the event of bringing out less than 10 men, the Consultants will refund to the Company at the rate of 700 U.S. Dollars per man.

Payment of the above mentioned amount will be effected in favour of the Consultants in the First National Bank, Clairton, P. A., U.S.A.

If a member or members of the team will be needed in the frame of this contract at any other place outside Rourkela, Company will pay all costs in connection with such travel and stay at such place. Application of approval for journey will be made by the member(s) of the team and forwarded to Company. Only after Company has sanctioned the journey the respective member(s) may leave Rourkela.

Company will leave on request at the disposal of the Superintendent or Assistant Superintendent of the Consultants two cars with drivers. The Company shall bear all the operation, maintenance and servicing charges.

In the event of the death of member of team or of their families in India, Company shall, if requested by the Consultants, arrange and defray the costs in U.S. Dollars as well as in Rupees of the return of the remains to the U.S.A. or in connection therewith.

## ARTICLE 6.

*Accommodation:*

For each member of the team three bedroomed Bungalows with one air-conditioner, furnished according to European standards for Engineering personnel with a refrigerator, a cooking range and sufficient kitchen equipment, shall be supplied by Company at rental applicable to Company's employees.

Drinking water will be provided free. as in the case of Company employees.

Electricity charges will be payable at the same rates as paid by Company's employees. The prevailing rate for electricity is Rs.0.07 nP per kwh.

For reasons, both technical and operational, it is absolutely necessary that the accommodation of the Superintendents should be reached by phone. Respective telephone connection, therefore, should be provided free of charge by the Company. Apart from private trunk calls, other telephone calls of the Superintendent will also be borne by the Company.

## ARTICLE 7.

*Taxes:*

Company will be liable to pay on behalf of the Consultants and/or the members of the team all taxes and fees and levies which may be leviable by the Indian Government, State and/or any other Local Authority on the Consultants and/or on the members of the team. Company shall release the Consultants and the members of the team of all obligations in this respect and will obtain income-tax clearance certificates for the Consultants and the individuals at the

appropriate time crediting the Consultants and each of the staff members with payment of all Indian taxes.

## ARTICLE 8.

*Free Medical and Surgical Attendance:*

Free medical attendance and surgical treatment including medicines and hospitalization will be provided in the German Hospital so long as it is in existence and later in the Ispat General Hospital. In case it becomes necessary to avail treatment outside Rourkela, the expenses will be met if the Chief Medical Officer of the Company will certify it as reasonable and necessary.

## ARTICLE 9.

*Leave:*

a) Each member of the team is entitled to 30 days paid leave for each completed year of service or $\frac{1}{12}$ of the actual period of engagement.

b) *Paid Holidays:*

In addition the following holidays will be allowed:

| | |
|---|---|
| New Year's Day 1st January | — 1 day |
| Republic Day 26th January | — 1 day |
| Holi | — 1 day |
| Easter Monday | — 1 day |
| Holiday of Work 1st May | — 1 day |
| White Monday | — 1 day |
| Independence Day 15th August | — 1 day |
| Dusserah | — 2 days |
| Diwali | — 1 day |
| Christmas | — 2 days |

## ARTICLE 10.

*Special Provisions:*

The Company will provide entry, residential and working permits, registration papers, Income-tax Clearance Certificate, etc. for the members of the Operation Team as well as for their families.

The foreign personnel will be under the technical and administrative control of the Superintendent or the Head of the Group and Superintendents and Heads of the Groups will be under administrative control of the General Superintendent of the Company.

The obligations of the Consultants out of this frame contract or in connection therewith are limited to:

furnishing of the qualified team mentioned above, having the responsibility in so far, as to select the members of the team with respect to their qualification with the same care that the contractor exercises in their own behalf.

The Consultants cannot be held responsible for any damages, including subsequent and/or consequential damages caused by the Consultant's personnel irrespective of the cause and nature of such damage.

No member of the team will be held responsible by the Company for loss or damage unless the failure is caused by gross negligence of such member. The decision whether such losses or damages were caused by gross negligence and what actions are to be taken shall be effected by a Committee consisting of the Indian Superintendent of the Plant and the foreign Superintendent of the operation team. In case the matter cannot be decided, it has to be clarified by the Company and the Head Office of the Consultants.

## ARTICLE 11.

Company will insure the members of the team for the sum of $50,000 in case of death caused by sickness or for accident and/or in case of permanent disability.

## ARTICLE 12.

*Arbitration:*

\*　　\*　　\*　　\*　　\*　　\*

## ARTICLE 13.

*Interpretation of the Contract:*