In the Matter of BORNE CHEMICAL COMPANY, INC., a corporation of the State of New Jersey, Debtor-in-Possession.

John W. BITNER, Isa R. Coble, William T. Galey, Walter B. Levering, Jr., Walter F. Martin, Andrew R. Rolfe, Robert H. Smellie, Jr., Mary G. Wilson and C. Merritt Winsby, and the class of all persons who were stockholders of The Rolfite Company on November 30, 1979, Plaintiffs,

v.

BORNE CHEMICAL COMPANY, INC., Debtor-in-Possession, Defendant.

Bankruptcy No. 80–0468.

United States Bankruptcy Court, D. New Jersey.

Aug. 28, 1981.

Crummy, Del Deo, Dolan & Purcell by Frank J. Vecchione, Newark, N.J., for debtor-in-possession.

Pitney, Hardin & Kipp by Roger C. Ward, Morristown, N.J., for present and prospective class members.

Henry J. Wilewski, Jersey City, N.J., for Wayne Bowers.

OPINION ON REMAND

D. JOSEPH DeVITO, Bankruptcy Judge.

This Opinion and ruling results from the Order of the Honorable H. Curtis Meanor, United States District Court Judge for the District of New Jersey, who, on application for leave to appeal from the Order of this Court dated December 1, 1980, remanded the captioned adversary proceeding for the purpose of giving the Rolfite related claimants a hearing on the present value of their claims, as mandated by Section 502[c] of the Bankruptcy Code.

In accordance with the remand instructions, this Court set about to examine and consider the relative merits of Borne's initial complaint filed against Rolfite Company, et al. in the Superior Court of New Jersey, Chancery Division, Union County, and the Rolfite related counterclaims against Borne. In accordance with stipulated procedures governing the conduct of the § 502[c] estimation proceeding of the Rolfite related claims, considerable quantities of material, including affidavits, transcripts of depositions, documentary proofs, state court pleadings, etc. were submitted to the Court for review and consideration.[1] The agreed to procedures reserved to counsel the right to cross-examine deponents, submit briefs, and an opportunity for oral argument. The remand hearing was held on February 27, 1981. Counsel having theretofore waived their right of cross-examination, the hearing was limited to oral argument. As a result of the foregoing, the record before the Court, upon which its ruling is formulated, is limited to the aforesaid material, the record made at the original hearing on the complaint, oral argument and briefs.

To achieve a better grasp of the issues involved, particularly the bona fides and validity *vel non* of the state court action commenced by Borne, this Court has found it advantageous to group the factual and legal areas of contention, to wit:

a) Did Borne breach a contractual obligation to manufacture Rolfite products.

b) Does Borne have a good-faith claim to four specific products developed by the chemist, Wayne E. Bowers; namely, fly ash treatment, insoluble starch xanthate, coal-oil mixture stabilizers and high reactivity magnesium oxide. Subsumed thereunder: Was Bowers an employee of Borne, or an independent contractor during the period of his employment with Borne when he is alleged to have developed the said products.

c) Is Borne's state court action against Rolfite one of malicious prosecution.

d) Did the said state court action cause the Quaker-Rolfite merger to fail.

e) Damages.

f) Equitable consideration.

## PROCEDURAL HISTORY

1. On or about August 21, 1979 the above debtor, Borne Chemical Company, Inc., et al., commenced an action against Rolfite Company, et al., in the Superior Court of New Jersey, Chancery Division, Union County.

2. Rolfite and the individual defendants Gilbert, Alexandre and Schenck, principal officers and directors of Rolfite, counterclaimed against Borne, et al., alleging, *inter alia*, that they, as stockholders of Rolfite, were damaged by Borne Chemical's tortious interference with the prospective merger of Rolfite into a subsidiary of Quaker Chemical Corporation. Counterclaimants asserted that damages could be calibrated as of November 30, 1979 (the last day the merger could be effected), on the basis of the anticipated exchange of Rolfite and Quaker shares of stock; and since, at that time, the Quaker stock was represented to have had a much greater value than the Rolfite stock, Rolfite shareholders were tortiously deprived of their right to Quaker stock, which deprivation is calculable in terms of total dollar damages.

3. Messrs. Gilbert, Alexandre and Schenck, by appropriate motion filed in the above noted state court action, also sought to rep-

1. Annexed hereto is an appendix of the afore- noted materials.

resent the class of all shareholders of Rolfite, asserting on behalf of said class essentially the same claims which they asserted against Borne in both the state court action and in the Chapter 11 proceedings.

4. Judge Edward McGrath of the Superior Court of New Jersey, Chancery Division, Union County, ruled against the individual defendants Gilbert, Alexandre and Schenck on their motion for class action certification pursuant to N.J.Civ.Prac.R. 4:32–1 *et seq.*, concluding that a potential conflict of interest could develop between the principals of Rolfite, Gilbert, Alexandre and Schenck, and other individual shareholders of Rolfite.

5. On February 15, 1980 Borne Chemical Company, Inc. initiated these proceedings by filing a Chapter 11 petition.

6. As a consequence of Judge McGrath's ruling, other alleged damaged Rolfite shareholders, Bitner, et al., represented by independent counsel, sought permission as creditors of Borne to intervene and to certify class in the pending state court action, *Borne Chemical Co. v. Rolfite Co.*[2]

7. The aforesaid motion to intervene, etc., was successfully opposed by the debtor Borne Chemical Company because of movants' failure to obtain relief from the automatic stay imposed by 11 U.S.C. § 362, effected by the filing of the Chapter 11 proceeding by the debtor Borne Chemical Company, Inc. As a consequence, on August 6, 1980, the individual plaintiffs to the instant adversary proceeding, Bitner et al., filed a complaint in this Court seeking to vacate the stay to permit them individually and as a class to intervene in that action, to certify a class, and thereafter to prosecute any and all claims, including class action claims which said individual plaintiffs may have against the debtor and other plaintiffs in the aforesaid state court litigation.

8. On August 11, 1980 counsel for the present and prospective Rolfite-related claimants moved for an extension of time for the proposed intervenors, Bitner, et al., to file claims in these proceedings. That motion, purportedly filed to protect the rights of the same prospective class members to file claims in the event the state court should grant the motion for class certification, appears to have been prompted by claimants' apprehension that the Disclosure Statement would be approved, as required by § 1125[b] of the Bankruptcy Code, before the state court certification.

9. On August 21, 1980 the debtor Borne Chemical Co. filed its motion seeking a temporary disallowance of the Rolfite-related claims for all purposes during these proceedings, until said claims be fully and finally adjudicated or liquidated in the state court action. The debtor further proposed that upon the latter event the claims would be allowed as general unsecured claims, permitting claimants to participate in the Chapter 11 proceeding or any succeeding liquidation proceeding.

10. In their brief,[3] counsel for present Rolfite-related claimants and prospective Rolfite-related class members represent that twenty Rolfite-related claimants have, in fact, filed individual claims. Based upon their aggregate holdings of 181,095 shares of Rolfite stock, these twenty claimants assert damages in the total dollar amount of $1,442,091.[4]

11. On December 1, 1980 this Court modified the automatic stay to permit plaintiffs, individually and as a class, to proceed in the state court proceeding on their motion to intervene and to certify class; thereafter, to prosecute any and all claims, including class action claims which the plaintiffs may have against the defendant in that state court proceeding. The Court further ruled to temporarily disallow all Rolfite-related claims until final adjudication of the state court proceeding, and extended the time for the filing of claims by all Rolfite-related

---

**2.** With regard to the instant bankruptcy proceeding, Bitner, et al., are represented by Pitney, Hardin & Kipp, which firm also represents Rolfite and its principals, Gilbert, Alexandre and Schenck.

**3.** Filed on September 12, 1980 in opposition to debtor's earlier motion to disallow claims.

**4.** Rolfite-related claims alone exceed the accounts payable of Borne Chemical.

claimants in these proceedings to the 45th day following entry of judgment in their favor in the state court action, preserving to claimants the right to participate in these proceedings as general unsecured claimants.

In accordance with the remand order of January 12, 1981, this Court limits its considerations to the debtor's motion "to temporarily disallow claims from the Rolfite-related litigation," specifically, to the estimation of present value, if any, of the claims of the appellants.

## FINDINGS OF FACT

*I.* In the first count of the counterclaim filed by the defendants Rolfite, Tetrahedron, Gilbert, Alexandre and Skank against the state court plaintiffs Borne, Joseph Patrick and Stuart Patrick, counterclaimants allege that plaintiffs Borne, Joseph Patrick and Stuart Patrick breached contractual agreements between the parties, whereby Rolfite agreed to provide raw materials and Borne agreed to manufacture those materials into finished products for Rolfite. The record fails to support either oral or written agreements to that effect. See Exhibit A in Appendix No. 7 (Summary of Management Review Meeting-January 2, 1979) at page 10 (marked 500154A) and Exhibit B in Appendix No. 7 (Internal Rolfite Memorandum) at page 6 (marked 500169). Also see Exhibit 5 at page 16 in Appendix No. 1.

*II.* In a letter to Anthony Alexandre, president of Rolfite, dated July 19, 1979, Stuart Patrick, president of Borne, announced that there was need for new costs and conditions on the basis of which any future dealings between the two companies would have to be conducted. See Exhibit D in Appendix No. 7.

*III.* In the affidavit of A. Alexandre, dated January 31, 1980, Exhibit 26 in Appendix No. 3, deponent states that "on July 19, 1979 unilaterally and without any warning" Stuart Patrick breached the agreement between the parties by refusing to continue with the production of Rolfite products.

*IV.* In his affidavit of September 26, 1979, Wayne Bowers, a former director of development and manufacturing for Rolfite (1971–1974), and thereafter a chemical consultant for Borne (1974–1979) with respect to Borne's production of Rolfite's products, refers to "an arrangement" between Borne and Rolfite whereby the former was to produce and manufacture certain dispersion products for the latter. Bowers' affidavit also makes mention of a Secrecy Agreement entered into by Rolfite and Borne on or about January 17, 1973, alluding therein to a projected "production agreement acceptable to Rolfite." See Exhibit 8 in Appendix No. 1.

*V.* In paragraph 3 of his affidavit of October 31, 1979, Roger Gilbert chairman of the board and chief executive officer of Rolfite Company, makes reference to a general discussion of the "contractual relationship" between Rolfite and Borne. See Exhibit 19 at page 2 in Appendix No. 2.

*VI.* In an affidavit dated August 12, 1980, see Appendix No. 9, deponent Stuart Patrick alleges that, upon his assumption of managerial control of Borne in January of 1979, he, together with a new management team, conducted investigations which revealed activities by the defendants described therein as conspiratorial, consisting of defalcations, diversion of assets, particularly profits, products and chemical processes of Borne to and for the benefit of Rolfite, piracy of trade secrets and proprietary information belonging to Borne, and possible corporate espionage. Patrick's affidavit continues that it was in the context of the above discoveries that, by letter of July 19, 1979, see Exhibit R–23 in Appendix No. 5, he advised Rolfite that its relationship with Borne would have to be changed, specifically that unless the costs and conditions of continued manufacture of Rolfite products were made satisfactory to Borne, the relationship between the two would terminate.

*VII.* It appears that the letter of July 19, 1979 followed Borne's determination that to continue under the terms and conditions imposed by the prior management would be financially ruinous, particularly because of the negative cash flow that Borne's Eliza-

beth, New Jersey chemical division experienced in April or May of 1979. See Appendix No. 8 at 84; see also *id.* at 192–94 and 197–203; Exhibit R–23 in Appendix No. 5. At or about July 19, 1979, Borne substantially reduced the volume of manufacture of Rolfite products. Appendix No. 8 at 199.

*VIII.* On July 1, 1979 Wayne Bowers left Borne and returned to Rolfite as a full time employee. During this employment Bowers was also engaged in important technical work for, or on behalf of Tetrahedron, a New Jersey corporation incorporated in June of 1973. As late as August 16, 1977 Bowers owned all of the outstanding shares of Tetrahedron, in number 160. See Exhibit R–22 in Appendix No. 5.

*IX.* The bitterly controverted questions of law and fact converging, as it appears, on the ultimate factual question, namely, the ownership of the four aforementioned products developed by Wayne Bowers, call for a series of factual findings of major and minor importance involving, *inter alia,* the activities of Tetrahedron. It appears that all parties, at least semantically, agree that the issue of ownership of the four products should be decided by the state court. It is to be noted that, as to Tetrahedron, it is undisputed that: (a) plaintiffs in the state court action contend that Tetrahedron was the instrumentality by which Bowers and the other defendants obtained products and processes properly belonging to Borne, including the four aforementioned products so vital to the consummation of the contemplated Quaker Chemical—Rolfite merger (or stock swap); (b) Tetrahedron, a dormant corporation, was activated in August, 1977, with additional stock issued and subscribed for in accordance with the terms of a Subscription Agreement, see Exhibit R–22 in Appendix No. 5, dated August 16, 1977, resulting in the ownership of Tetrahedron divided among the following three interest groups: Borne with 26.7%, Bowers with 26.7% and Rolfite with 46.6%, see Exhibits R–18, R–19, R–21 and R–22 in Appendix No. 5; (c) plaintiffs' complaint alleges that two of its employees, Edward Kaye and Henry Ritell, purchased 26.7% of Tetrahedron stock to be held in trust for Borne;

that Edward Kaye wrongfully transferred the 80 shares in his name to Rolfite, and that, despite Borne's repeated requests, Rolfite has refused to transfer any Tetrahedron stock to Borne, contending that Tetrahedron is now its wholly owned subsidiary.

*X.* The Rolfite-related claimants, for their part, relying heavily on the affidavit of Wayne Bowers dated October 28, 1979, Exhibit 17 in Appendix No. 2, argue that Borne has no interest whatsoever in Tetrahedron or in any processes or products channeled through Tetrahedron's possession; the claimants do say, in point of fact, that none of the technologies and inventions conceived and developed by Bowers were ever assigned to, or otherwise acquired by Tetrahedron. Appendix No. 27 at 48; see Exhibit 8 at 10–11 in Appendix No. 1.

*XI.* Though it is beyond dispute that from September, 1974 through June 30, 1979, Wayne Bowers was in the employ of Borne, the record reveals a myriad of contradictory representations with respect to the employment status of Bowers during that period. See Exhibit 8 at 4, *et seq.,* in Appendix No. 1, *supra* ; Exhibit 17 at 4 in Appendix No. 2; Appendix No. 10, Vol. I, at 110; *id.,* Vol. II at 227–33; *contrast* Appendix No. 9 at 2–3; Appendix No. 8 at 56–61 and 83. See also Exhibit R–12 (series of documents numbered 11087 through 11145 representing payments made by Borne to Bowers on a monthly basis as a consultant) in Appendix No. 5; Exhibit R–13 in Appendix No. 5; Exhibit E in Appendix No. 7 (Bowers therein designated a "contract employee to Borne").

*XII.* That Bowers' employment status during the period in question is of crucial significance is supported by its direct relationship to Borne's alleged right of ownership, and/or its shop right claim to the four aforementioned products (namely, fly ash treatment, insoluble starch xanthate, coaloil mixture stabilizers, and high reactivity magnesium oxide) developed by Bowers during that time frame.

*XIII.* The Third and Fourth Counts of the Rolfite-related claimants' counterclaim al-

lege tortious interference with contractual relations and prospective economic advantage, and conspiracy to tortiously interfere with contractual relations and prospective economic advantage, respectively. Exhibit 5 in Appendix No. 1; also see Fifth and Sixth Counts of the Amended Counterclaim, Exhibit 10 in Appendix No. 2. Counterclaimants contend that Borne's filing of the state court complaint on August 20, 1979, immediately prior to the proposed Quaker-Rolfite merger, in fact but three days before Rolfite's stockholders were to convene for the purpose of voting on the proposed merger, was "intended to prevent the merger, had no major purpose other than to prevent the merger, had no validity or good-faith basis of its own, and did in fact prevent the merger." In short, the Rolfite-related claimants contend that Borne's suit is "groundless". See Appendix No. 17 at 8–9 and n. 5; also see par. 6 of the Sixth Count of the Amended Counterclaim, Exhibit 10 at 7 in Appendix No. 2 (". . . plaintiffs without probable cause have maliciously filed the false and groundless complaint. . ."). *But cf.* Appendix No. 22 at 25–6 and n. (unnumbered).

*XIV.* A cash settlement demand in the amount of $600,000.00 was initially proposed by Borne, ostensibly as the basis for further negotiation. A tentative settlement in the amount of $200,000.00 was actually reached by Rolfite and Borne, with Rolfite requiring as the sole condition precedent to the settlement, acquiescence by Quaker. See Exhibits I and J in Appendix No. 7; Exhibit 3 in Appendix No. 6; Appendix No. 27 at 65–7, 99, and 142–43. For whatever reasons, the settlement was not concluded.

*XV.* The Merger Agreement providing for the acquisition by Quaker of Rolfite and the exchange of stock between the two companies was executed on April 23, 1979.

*XVI.* An internal memorandum by E. J. Parks, an officer of Quaker, dated December 10, 1979, reveals that Alexandre and Schenck, two of Rolfite's principals, openly avowed their knowledge of Quaker's renouncement of the agreement for reasons other than the Borne lawsuit particularly because of the progress made in a negotiated settlement with Borne; that Rolfite believed and openly stated that it had reason to pursue litigation against Quaker, and that their attorneys were considering the possibility of suing Quaker for breach of contract; notwithstanding the foregoing, the Rolfite principals were hesitant to commence an action against Quaker because they did not "want to sue friends." See Exhibit K in Appendix No. 7.

*XVII.* By letter dated January 15, 1980, the firm of Olwine, Connelly, Chase, O'Donnell & Weyher, Rolfite's New York counsel, charged Quaker with many of the varied charges alleged in the Rolfite claim against Borne in the state court action; see Exhibit L in Appendix No. 7;[5] specifically, that the proffered reason for termination, the inability of Rolfite to comply with certain closing conditions resulting from the institution of the state court action between Rolfite and Borne, was without substance since that litigation was settled subject only to Quaker's approval. In its letter, Rolfite further alleges that, as a result of Quaker's failure to perform its obligations under the Merger Agreement, Rolfite and its stockholders, having been severely damaged in certain specified ways, failing a satisfactory resolution, Rolfite would have no alternative but to seek legal redress.

*XVIII.* In its decision of November 10, 1980, the Court, expressing its desire to protect the rights of the claimants, granted the motion to extend time within which the prospective Rolfite-related claimants may file proofs of claim. The Court further granted the relief sought in a complaint filed with this Court by the individual plaintiffs—Rolfite shareholders Bitner, et

---

5. Though the Steckroth affidavit, in describing the annexed exhibits, states that Exhibit L is a letter from the attorney for Rolfite to Quaker Chemical Company, the copy of the letter as annexed to the affidavit fails to contain an addressee. However, from a reading of the letter, it is clear that it was directed to Quaker, the party who terminated the merger agreement.

al., permitting them individually and as a class to proceed with the motion to intervene and to certify class, and thereafter to prosecute any and all claims, including class action claims which plaintiffs may have against the debtor and other claimants in the pending state court action. It does not appear that the class action counterclaim on behalf of the Rolfite stockholders has been filed in the state court.

## CONCLUSIONS OF LAW

The Rolfite-related claimants contend that Borne's state court action is, at least with regard to defendants Rolfite and its principals, "groundless", has no validity or good-faith basis of its own, was intended to and did, in fact, prevent the merger. Consideration of the foregoing in the context of the totality of the state court pleadings raises serious questions as to the legal theory underlying subject claims.

The Rolfite claimants maintain that the institution of the state court action *caused* the proposed Quaker-Rolfite merger to collapse, with current prospects of such merger ranging from uncertain to, perhaps, nonexistent. Though their counterclaim has aspects of the torts of malicious prosecution and abuse of process, the claimants do not choose to base their claims on either of those conventional torts, but urge, instead, the commercial tort of destruction of business opportunity, that Borne's allegedly groundless lawsuit was but the vehicle for its tortious conduct.

Preliminary to a consideration of the above argument, we note that, in addition to allegations of tortious interference, Rolfite's stockholders allege Borne's breach of contract between the two. See Findings of Fact, *supra*, No. III. The latter issue raises two relevant and controverted factual questions: did a contract exist; if so, was it breached by Borne.

Borne was a manufacturer of Rolfite products in the area of dispersion product technology. Although the record is devoid of any proof in support of a formal contract, it appears that the parties had, over the years, developed an informal relationship. Following a change of Borne's top management and the launching of a far-reaching investigation encompassing their past relationship, Borne sharply curtailed its manufacture of Rolfite products.

Arguing that a contract may be implied between Borne and Rolfite based upon their course of dealing, Rolfite's stockholders allege that Stuart Patrick, Borne's new president, suddenly and unilaterally materially breached Borne's (implied) contract with Rolfite. (For a more detailed explication of the surrounding facts, see Findings of Fact, *supra*, I through V.)

■ The Court agrees that under certain circumstances an agreement may be implied from course of dealing; see N.J.S.A. 12A:1–201[3]; and that, unless otherwise agreed, the Court may under certain circumstances fill in terms left open by an agreement (apart that is, from the essential quantity term, which may never be left completely open); see N.J.S.A. 12A:2–306[1]; also see J. White & R. Summers, Uniform Commercial Code 121–27 (2d ed. 1980); *Requirement Contracts, "More or Less", Under the Uniform Commercial Code*, 33 Rutgers L.Rev. 105 (1980); the touchstone for such construction being the terms supplied by course of performance, course of dealing, and usage of trade; N.J.S.A. 12A:2–208[1] and [2]; also see J. White & R. Summers, *supra*, at 98–104.

Furthermore, though a plausible argument can be made to the contrary, we are inclined to credit the tacit assumption by the Rolfite-related claimants, who argue for a contract found by implication from course of dealing, that Article 2 which, by its terms, is restricted to transactions in goods, N.J.S.A. 12A:2–102, applies by analogy to the past commercial dealings between Rolfite and Borne at issue here. Certainly, the clearly emerging and recurring trend has been to synthesize commercial contract law by adopting new statutory principles from the Code into the body of the common law. See, e.g., *Kroeze v. Chloride Group Limited*, 572 F.2d 1099 (5th Cir. 1978); *Calloway v. Manion*, 572 F.2d 1033 (5th Cir. 1978); *Craft*

*v. Economy Fire & Cas. Co.*, 572 F.2d 565 (7th Cir. 1978); *Aluminum Co. of Am. v. Essex Group, Inc.*, 499 F.Supp. 53 (W.D.Pa. 1980); *Ainger v. Michigan General Corp.*, 476 F.Supp. 1209 (S.D.N.Y.1979), *aff'd* 632 F.2d 1025 (2d Cir. 1980); *Andrucci v. Gimbel Bros.*, 365 F.Supp. 1240 (W.D.Pa.1973), *aff'd mem.*, 505 F.2d 729 (3d Cir. 1974). See also Murray, *Under the Spreading Analogy of Article 2 of the Uniform Commercial Code*, 39 Fordham L.Rev. 447 (1971).

 Assuming that an existing enforceable contract was unilaterally terminated by Stuart Patrick, surely the salient consideration is whether such a contract, unless otherwise agreed, is terminable at any time by either party, upon notice. See N.J.S.A. 12A:2–309[2] and U.C.C. Comment 7 thereto. The controlling principle here was stated in *Seneca Falls Machine Co. v. McBeth*, 368 F.2d 915, 917 (3d Cir. 1966), "Where there is no provision in a contract for its termination, ordinarily the contract is terminable at will by any party to it. [Citation omitted]."

Since this Court here determines that Patrick had the right to terminate at will the existing Rolfite-Borne contractual arrangement, any discussion of motive would be supererogatory. However, because of the emphasis laid by counsel for the Rolfite stockholders on the *timing* of Patrick's move, the Court feels impelled to note that in context the demands made by S. Patrick of A. Alexandre, Exhibit D in Appendix No. 7, to alter the existing working relationship between Rolfite and Borne have a relevant basis. It appears that Borne's demands were occasioned, at least in part, by the loss of Wayne Bowers' services, who some three weeks prior had left Borne to become a full time employee of Rolfite, Bowers' prior employer for the period 1971–1974. Patrick's fears had a rational basis in fact. For some time, during his employment with Borne, Bowers had supervised the production of Rolfite products. It follows that, if Borne was to meet Rolfite's specifications, Bowers' continued supervision was important. Indeed, it appears that his supervisory know-how was the principal reason underlying Bowers' employment by Borne in the fall of 1974. Under the above noted circumstances, it cannot be deemed a mark of sinister intent for Patrick to include a demand for a new indemnity agreement with Rolfite, together with the proposed economic changes in the contract. The demand by Patrick for a reversal of indemnity against liability, hitherto shouldered by Borne, appears justified by changed conditions.

We turn now to the allegations of Rolfite stockholders, charging Borne with tortious interference with contractual relations and/or business opportunity. A concise definition of this tort appears in 4 Restatement (Second) of Torts § 766 (1979):

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

 The "malice" requirement, frequently invoked in judicial opinions, connotes not ill will, but merely intentional interference without justification. *Id.*, Comment "s" at 16; *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 588, 175 A. 62 (E. & A. 1934). "Malice", so defined, is also an essential element of the tort of malicious prosecution, or malicious or wrongful use of process, as it is sometimes designated when the underlying cause of action is a civil proceeding rather than a criminal prosecution.

Though the Rolfite claimants prefer to base their alleged claims on the theory of interference with a prospective economic advantage, it is apparent that, as applied to the case at bar, that tort is but the converse of the tort of malicious prosecution. The elements of both causes of action are substantially the same, centering on malice, good faith, and lack of probable cause, all of which have been pleaded in the Rolfite stockholders' counterclaim.

The four elements of the tort of malicious prosecution under the law of New Jersey are summarized in *Voytko v. Ramada Inn of Atlantic City*, 445 F.Supp. 315, 322 (D.N.J.1978), a decision in which plaintiffs' 42 U.S.C.A. § 1983 rights were vindicated after baseless criminal charges had been brought against them under a defrauding of innkeepers statute:

> (1) a criminal proceeding must have been instituted or continued by the defendant against the plaintiff;
>
> (2) terminated in favor of the accused;
>
> (3) with absence of probable cause for the charge; and
>
> (4) with malice (which may be inferred from lack of probable cause) or primary purpose other than bringing the offender to justice. [Citations omitted.]

*See generally* 3 Restatement (Second) of Torts § 653 *et seq.* (1977).

As already noted, malicious prosecution is roughly coextensive with malicious use of process (but not with malicious abuse of process), requiring the same proof; *see Voytko, supra,* at 324–25. *See generally* 3 Restatement (Second) of Torts §§ 674 and 675 (1977) (quoted in *Hernon v. Revere Copper & Brass, Inc.*, 363 F.Supp. 96, 98 (E.D. Mo.1973), *aff'd,* 494 F.2d 705 (8th Cir. 1974)).

New Jersey law requires that a plaintiff in an action for malicious prosecution of a civil suit must also establish a "special grievance", defined as interference with one's liberty or property. *The Penwag Prop. Co. v. Landau*, 76 N.J. 595, 598, 388 A.2d 1265 (1978); *Mayflower Indus. v. Thor Corp.*, 15 N.J.Super. 139, 151–52, 83 A.2d 246 (Ch.Div.1951), *aff'd,* 9 N.J. 605, 89 A.2d 242 (1952).

Whether an employer-employee relationship existed between W. Bowers and Borne during the years Bowers was in the employ of Borne, or whether, on the contrary, Bowers was an independent consultant to Borne is an ultimate question of fact in this case which we leave to the state court to resolve. The courts have traditionally applied common law principles in this area and have recognized that the "right to control" test is an important, though not conclusive, controlling factor in the determination of whether a worker is an employee or independent contractor. *See Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962), *reh. denied,* 370 U.S. 965, 82 S.Ct. 1579, 8 L.Ed.2d 833 (1962); *American Consulting Corp. v. United States*, 454 F.2d 473 (3d Cir. 1971); *Youngken v. United States*, 407 F.2d 836 (3d Cir. 1969); *Steel City Transp., Inc. v. N.L.R.B.*, 389 F.2d 735 (3d Cir. 1968); *Jeffer v. United States*, 76–1 U.S.T.C. 84,128 (D.N.J.1976). See also 1 Restatement (Second) of Agency § 220 (1958).

Bowers resigned from Borne a mere six months after Stuart Patrick and the rest of the new management team had assumed control. In addition to Patrick's adamant avowals at his deposition and in his affidavit, and notwithstanding Kaye's repeated denials, it appears unmistakably clear that Kaye did represent to Patrick and, accordingly, led him to believe that Bowers was, as Kaye put it, "a contract employee to Borne." Accordingly, the Court finds that Patrick had a good-faith basis for believing that Bowers was an employee of Borne, as opposed to an independent consultant. On that basis alone and without reference to other considerations such as Borne's participating interest in Tetrahedron, Borne's claim to the four products, whether by reason of a shop right or outright ownership interest, is at least colorable. Under such circumstances, Borne's claim cannot be deemed to be actuated by malice. Bowers' denials of an employer-employee relationship with Borne have, in common with Kaye's representations, the fact that they were all made after the fact and appear to be self-serving. Indeed, Bowers' own alleged pecuniary losses, asserted (individually) in a counterclaim based upon the tort of interference with a prospective economic advantage, require that he so aver: a position inconsistent on its face with the consent order entered into by Bowers on December 26, 1979, enjoining him from revealing confidential or proprietary information and trade secrets relative

to Borne projects in which, by his own admission, Bowers participated. Exhibit N in Appendix No. 7. In *American Consulting Corp.*, wherein the Third Circuit had occasion to consider the issue of whether steel consultants contracted with the plaintiff corporation to work abroad in foreign steel mills were its employees or independent consultants, the court held that, while the belief and intentions of a party as to his status are relevant considerations, they are not determinative of the issue. 454 F.2d at 480 (citing *Youngken, supra*).

In the period 1974-1979 Bowers was employed as a consultant to both Rolfite and Borne, and concomitantly engaged in independent research for himself and for Tetrahedron. Bowers' above employment alliances, existing long before the advent of Stuart Patrick, contained the seeds of an impacted system of conflicts that were bound, sooner or later, to result in litigation concerning the ownership of processes and products invented by Bowers during that time period.

Upon a careful consideration of all of the credible evidence, exhibits, oral argument and briefs, this Court finds that Borne's institution of a state court proceeding was not an improper use of the judicial process. Under such circumstances, the Court has serious reservations of the ability of the Rolfite-related claimants to support their charge of tortious interference and, by ineluctable force of inference, the implicit charge of malicious prosecution. As noted in *Rothermel v. International Paper Co.*, 163 N.J.Super. 235, 244, 394 A.2d 860, New Jersey Superior Court, Appellate Division, 1978, the court, in affirming that termination of a consensual relationship is not a basis for recovery in tort, stated:

> That which one has a right to do cannot become a tort when it is done.

It is essential to the success of the Rolfite-related claims that Borne's institution of an action against Rolfite and the other named defendants, challenging, *inter alia*, Rolfite's right to technology, be shown to have caused the proposed merger to abort. That demonstration must be made irrespective of the alleged groundlessness of Borne's charges. It is undisputed that Quaker evinced keen interest in the acquisition of the four products, or technologies; however, it simply does not follow from that premise that Quaker's subsequent move to renounce the merger agreement with Rolfite resulted from Borne's state court litigation. On the contrary, the recitals of Findings of Fact set forth above and, particularly, our review of Rolfite's internal memoranda detailing its own misgivings, lead this Court to conclude that Quaker renounced the merger agreement because it was having second thoughts about its acquisition of Rolfite.

By reason of all of the foregoing, this Court is constrained to ascribe a zero value to the claims considered. Our Opinion of November 10, 1980 adequately protects the rights of all parties to these proceedings, temporarily disallowing the twenty-one Rolfite-related claims (as well as that of Wayne Bowers), while simultaneously, pursuant to § 1141[d] of the Bankruptcy Code, protecting those claims in the event they are ultimately adjudged successful in the pending state court action by requiring, in effect, a waiver of discharge from Borne with respect to such Rolfite-related claims *pro tanto* Borne's other general unsecured creditors.

The Court hereby incorporates by reference all equitable considerations expressed in our earlier Opinion as buttressing that decision, which we here reaffirm.

The Order of December 1, 1980 is reaffirmed in its entirety.

### APPENDIX

1. Volume I entitled Table of Contents, containing pleadings, motions, orders, opinions, etc. entered in the state court action.

2. Volume II entitled Table of Contents, containing pleadings, motions, orders, opinions, etc. entered in the state court action.

3. Volume III entitled Table of Contents, containing pleadings, motions, orders,

opinions, etc. entered in the state court action.

4. Volume entitled Exhibits Marked on Deposition by Borne, P1, P2, P3, P4, P5, P36, P39, P40.

5. Volume entitled Exhibits Marked on Deposition by Rolfite, R12, R13, R14, R15, R16, R18, R19, R20, R21, R22, R23, R24, R27.

6. Volume entitled Documents Produced by Quaker Chemical Corporation containing 19 items as listed in its table of contents.

7. Affidavit of Donald H. Steckroth and Appendix of Exhibits in Proceedings for Estimation of Claims.

8. Deposition of Stuart K. Patrick.

9. Affidavit of Stuart K. Patrick, dated August 12, 1980, filed in the Borne Chemical Co., Inc. reorganization proceeding, United States Bankruptcy Court, District of New Jersey.

10. Deposition of Edward M. Kaye, Volume I & II, pursuant to order of Judge McGrath of the New Jersey Superior Court, Chancery Division, entered in the matter of Borne Chemical Company, Inc., a corporation, Joseph A. Patrick and Stuart K. Patrick, Plaintiffs, vs. The Rolfite Company, et al., Defendants.

11. Deposition of Edward M. Kaye, Volume III, IV & V.

12. Complaint on behalf of John W. Bitner, et al. for relief from the automatic stay, filed August 6, 1980.

13. Notice of Motion To Extend Time Within Which Prospective Class Members May File Claims, filed August 6, 1980.

14. Affidavit in Support of Motion To Extend Time Within Which Prospective Class Members in State Court Action May File Claims, filed August 6, 1980.

15. Notice of Motion To Disallow Claims from Rolfite-Related Litigation, filed August 21, 1980.

16. Affidavit of James C. Pitney in Proceedings for Estimation of Claims, filed February 17, 1981.

17. Letter of Pitney, Hardin & Kipp dated January 28, 1981, attached to letter of January 27, 1981 containing recommendation for procedures to be followed by the bankruptcy court in the estimation of the so-called Rolfite-related claims.

18. Letter of Crummy, Del Deo, Dolan & Purcell of February 2, 1981, directed to this Court, containing comments on the remand of Judge Meanor and the issues to be considered.

19. Letter of Crummy, Del Deo, Dolan & Purcell dated February 5, 1981.

20. Letter of Pitney, Hardin & Kipp dated February 6, 1981.

21. Letter of Pitney, Hardin & Kipp dated February 17, 1981.

22. Letter of February 20, 1981 from Pitney, Hardin & Kipp, directing the Court's attention to typographical errors contained in attached memorandum dated February 17, 1981.

23. Letter of Crummy, Del Deo, Dolan & Purcell dated February 24, 1981.

24. Debtor's Memorandum in Opposition to the Rolfite-Related Claimants in Section 502[c] Estimation Proceedings.

25. Order entered in the United States Bankruptcy Court on December 1, 1980, modifying the automatic stay of § 362[a] to permit plaintiffs, individually and as a class, to proceed in the state court proceeding with their motion to intervene and to certify class.

26. Transcript of proceedings held before the Honorable H. Curtis Meanor, U.S. D.J., in the matter of Borne Chemical Co., Inc. on December 22, 1980.

27. Transcript of proceedings held before the Honorable D. Joseph De Vito on February 27, 1981, in the matter of Borne Chemical Co.; John W. Bitner, et al. vs. Borne Chemical Company, Inc.

28. Application for Leave To Appeal from Interlocutory Order of Bankruptcy Court, filed December 11, 1980.