RENDERED:  NOVEMBER 8, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0959-MR

LAURA PANTOJA                                                     APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v.            HONORABLE JULIE KAELIN, JUDGE
ACTION NO. 22-CI-005951

ATOMIC TRANSPORT, LLC AND
JUSTIN CYPHERT                                                   APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; ACREE AND L. JONES, JUDGES.

ACREE, JUDGE:  Appellant, Laura Pantoja, appeals the Jefferson Circuit Court's

order granting summary judgment in favor of Appellees, Atomic Transport, LLC

and Justin Cyphert.  We affirm.

## BACKGROUND

Pantoja held a commercial driver's license and owned her own truck, or tractor unit, when she began work for Atomic Transport as an owner-operator. She initiated this action against her supervisor and the company in the Jefferson Circuit Court alleging Appellees violated the Kentucky Civil Rights Act (KCRA), KRS[1] 344.010 *et seq.*, by allowing and committing acts of sex-based discrimination against her.

Pantoja was the only female driver at Atomic Transport. She reported numerous instances of alleged sexual harassment perpetrated by the male truck drivers and supervisor Justin Cyphert. She also claimed Cyphert retaliated against her because she reported sexual harassment. Appellees moved for summary judgment claiming she was an independent contractor, not an employee, and her claim was legally untenable because the KCRA only protects employees. The circuit court granted the motion for that reason.

The circuit court's decision was based on numerous undisputed material facts that established Pantoja's independent contractor status as a matter of law. Appellees identified those material facts generally as follows.

Pantoja had the opportunity to drive an Atomic Transport tractor unit as a company employee but elected not to. She owned her own tractor unit and

---

[1] Kentucky Revised Statutes.

decided to negotiate and execute an "Independent Contractor Agreement" with Atomic Transport establishing her relationship with the company as an owner-operator. As discussed in more detail in the analysis, the following summarizes key aspects of the relationship.

The agreement between the parties did not merely secure Pantoja's services as a driver. It incorporated the lease of her tractor unit as required by federal regulation. As an owner-operator, Pantoja was paid by the ton of municipal solid waste hauled from temporary "trash stations" to permanent landfills. She was paid in gross without withholding taxes or insurance premiums, and her pay was reported to the Internal Revenue Service on IRS Form 1099. Pantoja did not participate in Atomic Transport's employee benefits program.

In response, Pantoja claims there is no actual distinction between the owner-operators and the Atomic Transport employees. To make her point to the circuit court that genuine issues of material fact remain, she noted characteristics shared by employees and owner-operators alike.

The Jefferson Circuit Court was unpersuaded by her arguments and granted summary judgment. She now appeals that order.

## STANDARD OF REVIEW

"An appellate court's role in reviewing a summary judgment is to determine whether the trial court erred in finding no genuine issue of material fact

exist[ed] and the moving party was entitled to judgment as a matter of law."

*Feltner v. PJ Operations, LLC*, 568 S.W.3d 1, 3 (Ky. App. 2018). Thus, appellate courts review a circuit court's summary judgment *de novo*. *Cmty. Fin. Servs. Bank v. Stamper*, 586 S.W.3d 737, 741 (Ky. 2019).

## ANALYSIS

"It is an unlawful practice for an *employer* . . . to discriminate against an individual with respect to . . . terms, conditions, or privileges of employment, because of the individual's . . . sex . . . or . . . adversely affect [her] status as an *employee*, because of [such] individual's . . . sex . . . ." KRS 344.040(1)(a) (emphasis added). The KCRA thus protects every "'Employee' . . . employed by an employer . . . ." KRS 344.030(5)(a). The KCRA protects employees, but "d[oes] not apply to protect independent contractors from discrimination." *Steilberg v. C2 Facility Sols., LLC*, 275 S.W.3d 732, 734 (Ky. App. 2008).

As in *Steilberg*, the issue here is whether the discrimination claimant's status was that of an employee or independent contractor. Our examination of the record convinces us there is no genuine issue regarding any material fact that would prevent a determination of the issue as a matter of law. The record supports the circuit court's conclusion that Pantoja's association with Atomic Transport was as an independent contractor and, the KCRA being inapplicable to independent contractors, Appellees were entitled to judgment as a matter of law.

-4-

In *Steilberg*, this Court said, "This test [to determine whether an individual is an employee or independent contractor] requires a careful case-by-case consideration of the facts." *Id.* at 736. But what is the test?

The current version of this test originated in the Supreme Court of the United States' opinion of *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989). That Court repeated the test in *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992). The Sixth Circuit paraphrased *Darden* in *Simpson v. Ernst & Young*, 100 F.3d 436 (6th Cir. 1996), and in *Steilberg*, this Court quoted the wording of the test we found in *Simpson*. *Steilberg*, 275 S.W.3d at 735-36 (citing *Simpson*, 100 F.3d at 443, with attribution to *Darden*). We reiterate the test by returning to the source – *Community for Creative Non-Violence v. Reid* – numbering and spacing its criteria for ease of reference. *Reid* says:

> In determining whether a hired party is an employee under the general common law of agency, we consider the
>
> [1] hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are
>
> [2] the skill required;
>
> [3] the source of the instrumentalities and tools;
>
> [4] the location of the work;
>
> [5] the duration of the relationship between the parties;

-5-

[6] whether the hiring party has the right to assign additional projects to the hired party;

[7] the extent of the hired party's discretion over when and how long to work;

[8] the method of payment;

[9] the hired party's role in hiring and paying assistants;

[10] whether the work is part of the regular business of the hiring party;

[11] whether the hiring party is in business;

[12] the provision of employee benefits; and

[13] the tax treatment of the hired party. . . .

No one of these factors is determinative.

*Reid*, 490 U.S. at 751-52, 109 S. Ct. at 2178-79 (footnotes and citations omitted).

For each criterion, the opinion cites existing federal caselaw, including previous opinions by the Supreme Court of the United States, some of which we discuss in relation to specific criteria below.[2]

---

[2] After filing her briefs, Pantoja moved for leave to cite supplemental authority. We granted the motion. That authority is a March 11, 2024 final rule of the United States Department of Labor offering agency guidance in analyzing the employee/independent contractor relationship. However, the rule does not affect our analysis. First, when it comes to federal agency rulings, "Courts must exercise their independent judgment . . . [and] need not . . . defer to an agency interpretation of the law . . . ." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273, 219 L. Ed. 2d 832 (2024), *reversing Chevron, U.S.A., Inc. v. Nat. Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). More importantly, the Department's "new rule" is hardly that. Rather, it rescinded a January 2021 rule titled "'Independent Contractor Status Under the Fair Labor Standards Act' [FLSA] (2021 IC Rule), providing guidance on the

*Reid* tells us this list is nonexhaustive and references the

RESTATEMENT (SECOND) OF AGENCY § 220 for further guidance, just as our own

Supreme Court has done. *Id.* at 752, 109 S. Ct. at 2179; *Ky. Unemp. Ins. Comm'n*

*v. Landmark Cmty. Newspapers of Ky., Inc.*, 91 S.W.3d 575, 579 (Ky. 2002)

(citing RESTATEMENT (SECOND) OF AGENCY § 220 (1958)). However, the list *Reid*

gives us is sufficiently comprehensive to address the criteria relevant to this

review.

1. <u>*Atomic Transport's right to control the manner and means by which the product is accomplished*</u>

Pantoja cites paragraph 3 of the Independent Contractor's Agreement

attempting to demonstrate Atomic Transport's exercise of control over her. That

paragraph is entitled, "<u>Possession, Control and Use of Equipment</u>." However,

rather than evince Atomic Transport's control, the paragraph identifies the

responsibility federal law mandates Atomic Transport assume as a federal motor

---

classification of independent contractors under the FLSA applicable to workers and businesses in any industry." Employee or Independent Contractor Classification Under the Fair Labor Standards Act, 89 Fed. Reg. 1638, 1638 (Jan. 10, 2024) (Executive Summary). The rescinded rule would have given varying weights to the different criteria used to make the employee/independent contractor distinctions. *Id.* "[T]his final rule" that Pantoja cites "returns to a totality-of-the-circumstances analysis of the economic reality test in which the factors do not have a predetermined weight and are considered in view of the economic reality of the whole activity." *Id.* at 1639. "[T]his critical reversion to the longstanding analysis that preceded the 2021 IC Rule," *id.*, simply re-established within the agency a status quo from which Kentucky courts never departed.

carrier, and expressly limits that responsibility and control as much as the law allows. In pertinent part, the paragraph says:

> [Atomic Transport] shall be deemed to have exclusive possession, control and use of [Pantoja's] Equipment and to have assumed complete responsibility for the operation thereof to *the minimum extent required* to comply with the leasing regulations of the Federal Motor Carrier Safety Administration contained in 49 C.F.R.[3] Part 376 (the "Leasing Regulations").

(Record (R.) 235) (emphasis added).

Contrary to Pantoja's interpretation, this is not proof of Atomic Transport's right to control the work she contracted to perform. "The regulations in this part ["Leasing Regulations," 49 C.F.R. Part 376] apply to . . . [t]he leasing of equipment[4] with which to perform transportation[,] . . . [by] motor carriers in the performance of transportation regulated by the Secretary [of Transportation]." 49 C.F.R. § 376.1.

To be clear, federal law required inclusion of the language Pantoja quotes. The regulation says that an agreement to lease Pantoja's tractor:

> shall provide that the authorized carrier lessee [Atomic Transport] shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee

---

[3] Code of Federal Regulations.

[4] "Equipment. A motor vehicle, straight truck, tractor, semitrailer, full trailer, any combination of these and any other type of equipment used by authorized carriers in the transportation of property for hire." 49 C.F.R. § 376.2(b).

> [Atomic Transport] shall assume complete responsibility for the operation of the equipment for the duration of the lease.

49 C.F.R. § 376.12(c)(1). Significantly, the Department of Transportation anticipated arguments such as Pantoja makes and added the following provision:

> Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. *An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102*[5] *and attendant administrative requirements*.

49 C.F.R. § 376.12(c)(4) (emphasis added).

Atomic Transport's "control" over the operation of Pantoja's tractor unit was limited to compelling her, pursuant to Paragraph 4 of the agreement, to comply with federal law or to terminate the relationship without notice under Paragraph 29(a)(iii) if she did not. The Independent Contractor Agreement reflects Atomic Transport's trust that Pantoja would comply with federal law without the need to commit its own supervisory resources to assure such compliance, leaving day-to-day operational control in Pantoja's hands.

If anything, this contract paragraph proves that, in addition to contracting for Pantoja's services, Atomic Transport was leasing her tractor unit.

---

[5] This section of the United States Code is entitled "Leased motor vehicles" and authorizes the regulations contained in 49 C.F.R. Part 376.

49 C.F.R. § 376.2(e) ("Lease. A contract or arrangement in which the owner grants the use of equipment, with or without driver, for a specified period to an authorized carrier [Atomic Transport] for use in the regulated transportation of property, in exchange for compensation."). This is further supported by Exhibit "A" to the parties' agreement, entitled "Receipt for Possession of Contractor's Equipment" identified as a 2010 International Prostar Premium, VIN # 3HSCUAPR6AN192472. (R. 246.)

Pantoja also claims Atomic Transport management determined the route she drove, how many loads she hauled, what days she worked, the sequence she picked up loads relative to other Atomic Transport drivers, the speed she traveled, and all safety procedures. These claims are not supported by the material facts about which there is no genuine dispute and cannot support a finding that Atomic Transport had the right to control how Pantoja performed.

In fact, Pantoja said under oath that she chose the route she drove based on traffic and construction delays, and that the days and hours she drove and how many loads per day she could haul was dependent on the hours the landfill was open. (R. 157-58; 317-18.)

The job she contracted to perform – hauling municipal solid waste from one specified point to another – largely dictated her route as shown on

Exhibit "B".[6] Pantoja admitted in deposition she could refuse to accept loads, just as the contract's Paragraphs 32 and 33[7] authorized, thus acknowledging she controlled how many loads she hauled. (R. 154.) With such control, it mattered little when she performed the contract. As long as Atomic Transport did not breach the contract by impeding her ability to perform, she remained in control.

Where speed and safety procedures are concerned, that was no more controlled by Atomic Transport than by Pantoja. Federal law mandated such things. For the same reason federal law required Atomic Transport as the federal motor carrier to be responsible for Pantoja's tractor, it had to include language in the contract allowing it to assure itself that Pantoja complied with all laws regarding speed and safety.

To whatever extent the record might suggest Atomic Transport ever overstepped its contractual bounds, that is not relevant. This criterion asks who has the *right* to control the work performed. Here, the record shows the contract Pantoja signed gave her, not Atomic Transport, the right to control the manner and means by which she performed her job. If Atomic Transport ever breached her

---

[6] Exhibit "B" said the contract was for "hauling Municipal Solid Waste . . . from Poplar Level TS [Trash Station] to Valley View LF [Landfill] . . . from BICO TS to Valley View LF . . . [and] from Rumpke TS to Rumpke LF . . . ."

[7] Paragraph 32 says: "Contractor agrees to accept only those shipments for which he/it can reasonably meet scheduled pick-up and delivery dates established by shippers . . . ." Paragraph 33 says: "Nothing contained in the Agreement shall be construed to: (a) Obligate Contractor to accept each load tendered by Carrier . . . ."

right to control her work, it was her prerogative to enforce the contract. Electing not to exercise that prerogative does not mean the right to control never existed.

These undisputed facts tend to mark Pantoja as an independent contractor under the first criterion.

2. *The skill required*

When the Justices in *Reid* considered this criterion – the skill brought to the task – they turned to the Second Circuit opinion in *Hilton International Co. v. NLRB* which involved "musicians and band leaders[,] . . . highly skilled members of a clearly distinct occupation . . . [who] usually provide their own instruments and their own sheet music." 690 F.2d 318, 322 (2d Cir. 1982) (cited in *Reid*, 490 U.S. at 751 n.19, 109 S. Ct. at 2178 n.19). The Court also considered its own musician/band leader case, *Bartels v. Birmingham*, in which the right to refunds of taxes paid by dance hall owners depended:

> on whether [those owners'] arrangements for bands to play at the dance halls made the band leaders and other members of the bands employees of the [dance hall owners] or whether, despite the arrangements, the leaders were independent contractors and therefore themselves the employers of the other members.

332 U.S. 126, 127, 67 S. Ct. 1547, 1548, 91 L. Ed. 1947 (1947) (cited in *Reid*, 490 U.S. at 751 n.19, 109 S. Ct. at 2178 n.19). In both cases, the band leader was held to have independently contracted with the dance hall owner but was the employer of the band members. *Bartels*, 332 U.S. at 132, 67 S. Ct. at 1551 ("elements of

-12-

employment mark the band leader as the employer"); *Hilton Int'l*, 690 F.2d at 323

("[B]and leaders are independent contractors who employ the musicians who

perform in the bands.").

But *Bartels*, as cited in *Reid*, leans heavily on an older Supreme Court

of the United States opinion with fact patterns closer to that in the instant appeal.

The opinion is captioned *United States v. Silk*, and it was conjoined with a

companion case, *Harrison v. Greyvan Lines*. *Bartels*, 332 U.S. at 127, 67 S. Ct. at

1548 (citing *United States v. Silk*, 331 U.S. 704, 67 S. Ct. 1463, 91 L. Ed. 1757

(1947), *abrogated by Reid*, 490 U.S. at 739, 109 S. Ct. at 2172, *as recognized in*

*Darden*, 503 U.S. at 325, 112 S. Ct. at 1349).[8]

Decided together, *Silk* and *Greyvan Lines* drew contrasts between

unskilled laborers and those with the skills of an entrepreneur. Both cases

involved truck or tractor unit owner-operators. In *Silk*, the owner-operators were

contrasted with laborers who did not operate trucks or tractors at all; in *Greyvan*,

---

[8] The abrogation of *Silk* does not diminish its relevance relative to this criterion. *Silk*, interpreting the Social Security Act, "read 'employee,' which neither [that statute nor another] helpfully defined, to imply something *broader than the common-law definition* . . . ." *Darden*, 503 U.S. at 324, 112 S. Ct. at 1349 (emphasis added) (footnotes omitted). Before *Reid*, when the Court defined the term "employee" in a particular legislative scheme, it factored in what it perceived to be the broader intent of the legislation. "[A]fter each opinion, Congress amended the statute so construed to demonstrate that the usual common-law principles were the keys to meaning." *Id.* at 324-25, 112 S. Ct. at 1349. Finally, the Supreme Court of the United States got the message. The result after the Supreme Court decided *Reid* was the "presumption that Congress means an agency law definition for 'employee' unless it clearly indicates otherwise[.]" *Id.* at 325, 112 S. Ct. at 1349. *Silk*'s take on the definition of "employee" was broader than the now-applicable common-law definition and, therefore, its discussion of the "skill-required" criterion tends to favor Pantoja.

the owner-operators were contrasted with laborers who did not own or drive their own trucks but drove company-owned trucks. As in *Bartels* and *Reid* and this appeal, the issue "turn[ed] on a determination as to whether the workers involved were employees . . . or whether they were independent contractors." *Silk*, 331 U.S. at 705, 67 S. Ct. at 1464.

In the eponymous case, Albert Silk Coal Company hired two kinds of workers, "some of whom were engaged in unloading railway coal cars and the others in making retail deliveries of coal by truck." *Id.* at 706, 67 S. Ct. at 1464, 1465. In the companion case, "Greyvan Lines, Inc., a common carrier by motor truck," utilized both owner-operators and workers who drove company-owned trucks. *Id.* at 707, 67 S. Ct. at 1465.

"Both lower courts in both cases . . . determined that [all] these workers are independent contractors." *Id.* at 716, 67 S. Ct. at 1469. The Supreme Court affirmed, in part, and reversed, in part. The Court agreed the owner-operators in both cases were independent contractors but concluded the non-driver laborers in *Silk* and the drivers in *Greyvan* who drove company-owned trucks were employees. The cases turn on the disparate skills of the workers. The Court described the more specific characteristics of the categories of workers as follows.

The first workers the opinion discussed were the coal unloaders engaged by the Silk Coal Company. The "coalyard consists of two buildings, one

-14-

for an office and the other a gathering place for workers, railroad tracks upon which carloads of coal are delivered by the railroad, and bins for the different types of coal." *Id.* at 706, 67 S. Ct. at 1464-65. Workers "come to the yard when and as they please and are assigned a car to unload and a place to put the coal." *Id.* at 706, 67 S. Ct. at 1465. "They furnish their own tools, work when they wish and work for others at will." *Id.* Some worked "as regularly 'as a man has to when he has to eat' but there was also testimony that some of the unloaders were floaters who came to the yard only intermittently." *Id.* They were not paid by the hour; they were paid "an agreed price per ton . . . ." *Id.*

The next group of laborers discussed also worked for Silk Coal Company. Because the company owned no trucks of its own, Mr. Silk "contract[ed] with workers who own their own trucks to deliver coal at a uniform price per ton. This is paid to the trucker by [Mr. Silk] out of the price he receives for the coal from the customer." *Id.* These owner-operator "truckers are not instructed how to do their jobs, but are merely given a ticket telling them where the coal is to be delivered and whether the charge is to be collected or not." *Id.* at 707, 67 S. Ct. at 1465. Silk's truckers benefitted in a way Pantoja did not – "[a]ny damage caused by [these truckers wa]s paid for by the company." *Id.* But like Pantoja, Silk's "truckers could and often did refuse to make a delivery without penalty . . . [and could] come and go as they please and frequently did leave the

-15-

premises without permission." *Id.* Just as with Pantoja, nothing in their arrangement with their principal prohibited them from "haul[ing] for others when they pleased"; they also were required to "pay all the expenses of operating their trucks, and [to] furnish extra help necessary to the delivery of the coal and all equipment . . . [and n]o record [wa]s kept of their time." *Id.*

Greyvan Lines, the appellee in the companion case, also engaged owner-operator truckers. Like Atomic Transport, Greyvan "operate[d] its trucking business under a permit issued by the Interstate Commerce Commission . . . . carrying largely household furniture." *Id.* at 708, 67 S. Ct. at 1465. The company's business model:

> was based on contracts with the truckmen under which the truckmen were required to haul exclusively for the respondent and to furnish their own trucks and all equipment and labor necessary to pick up, handle and deliver shipments, to pay all expenses of operation, to furnish all . . . insurance . . . , to pay for all loss or damage to shipments and to indemnify the company for any loss caused it by the acts of the truckmen, their servants and employees, to paint the designation "Greyvan Lines" on their trucks, to collect all money due the company from shippers or consignees, and to turn in such moneys at the office to which they report after delivering a shipment, to post bonds with the company . . . , to personally drive their trucks at all times or be present on the truck when a competent relief driver was driving (except in emergencies, when a substitute might be employed with the approval of the company), and to follow all rules, regulations, and instructions of the company. . . . The company's instructions covered directions to the truckmen as to where and when to load freight. If freight was

-16-

tendered the truckmen, they were under obligation to notify the company so that it could complete the contract for shipment in its own name. As remuneration, the truckmen were to receive from the company a percentage of the tariff charged by the company varying between 50 and 52% and a bonus up to 3% for satisfactory performance of the service. The contract was terminable at any time by either party. These truckmen were required to take a short course of instruction in the company's methods of doing business before carrying out their contractual obligations to haul. The company maintained a staff of dispatchers who issued orders for the truckmen's movements, although not the routes to be used, and to which the truckmen, at intervals, reported their positions. Cargo insurance was carried by the company. All permits, certificates and franchises "necessary to the operation of the vehicle in the service of the company as a motor carrier under any Federal or State Law" were to be obtained at the company's expense.

*Id.* at 708-09, 67 S. Ct. at 1465-66.

Not all Greyvan Lines truckers were owner-operators. "The company had some trucks driven by truckmen who were admittedly company employees. Operations by the company under the two systems were carried out in the same manner." *Id.* at 710, 67 S. Ct. at 1466. In her own case, Pantoja relies heavily on the commonalities owner-operators shared with company drivers to support an argument that she, being treated like drivers who drove Atomic Transport trucks, was as much an employee as them. That argument did not prevail in *Greyvan*.

In *Silk* and *Greyvan*, the distinction was the "skill required in the claimed independent operation[.]" *Id.* at 716, 67 S. Ct. at 1469. The Silk Coal

-17-

Company workers who unloaded railroad hopper cars had autonomy when it came to their hours and how they moved the coal to the coal bins, and they even used their own tools. They were not paid by the hour but by the ton. But that did not make them independent contractors. The Court said, "[W]e cannot agree that the unloaders in the Silk case were independent contractors." *Id.* at 716-17, 67 S. Ct. at 1470. They "provided only picks and shovels. They had no opportunity to gain or lose except from the work of their hands and these simple tools." *Id.* at 717-18, 67 S. Ct. at 1470. As in a case cited in *Silk* describing identical working conditions, the coal unloader "was a mere laborer; his work was simple; he was exercising no independent business; his work required no special skill." *Swift & Co. v. Alston*, 48 Ga. App. 649, 173 S.E. 741, 742-43 (1934) (cited in *Silk*, 331 U.S. at 718 n.14, 67 S. Ct. at 1471 n.14). These workers were not expected to self-supervise but were instructed in their work by other employees of superior position within the company. The Court affirmed the determinations that these were employees, regardless of the autonomy they enjoyed in performing the work.

Greyvan workers who drove company-owned trucks were "admittedly employees" and their status was not at issue. *Silk*, 331 U.S. at 710, 67 S. Ct. at 1466. However, notwithstanding the similarities in working conditions with that group, the owner-operators hired by both Silk and Greyvan were held to be independent contractors.

Touching upon the obvious interplay with the first criterion before reaching the second, the Court said, "[W]here the arrangements leave the driver-owners so much responsibility [of] the investment and management as here, they must be held to be independent contractors." *Id.* at 719, 67 S. Ct. at 1471. Driver-owners, or owner-operators, are businesspersons responsible for their own supervision, for their own investment in their equipment, managing both its use and their time spent maximizing their own profit. *Id.*

*Silk* then focused specifically on the second criterion. One opinion cited in *Reid* identified this criterion as the skillset by which a semi-truck owner-operator reaps " 'profits through the exercise of entrepreneurial skill and the ownership and maintenance' of equipment." *NLRB v. A. Duie Pyle, Inc.*, 606 F.2d 379, 382 (3d Cir. 1979) (quoting *News-Journal Co. v. NLRB*, 447 F.2d 65, 68 (3d Cir. 1971), *cert. denied*, 404 U.S. 1016, 92 S.Ct. 676, 30 L. Ed. 2d 664 (1972)) (cited in *Reid*, 490 U.S. at 751 n.19, 109 S. Ct. at 2178 n.19). As this Court once indicated, people become owner-operators precisely because they desire "their own 'business on wheels' . . . . " *Commonwealth ex rel. Stephens v. N. Am. Van Lines, Inc.*, 600 S.W.2d 459, 459 (Ky. App. 1979).

Distinguishing entrepreneurial truck owner-operators from the unloaders who possess a less sophisticated skillset, the Court said, "These driver-owners are small businessmen. They own their own trucks. They hire their own

-19-

helpers. . . . It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks these driver-owners as independent contractors." *Silk*, 331 U.S. at 719, 67 S. Ct. at 1471. Owner-operators like Pantoja and those in *Silk* and *Greyvan* – businesspersons all – did not bring picks and shovels to work. Exercising entrepreneurial skills and engaging in a business-to-business transaction, each one found a customer looking to lease his or her valuable equipment. The owner-operators provided and supervised a driver with the special skills necessary to acquire the commercial driver's license required to operate that equipment.

Pantoja understands what distinguishes her from the men who do not own their own rigs but drove company trucks. Her testimony revealed some of the distinctions by explaining the responsibilities of being a business owner. She said:

> I'm responsible for my truck. I don't just take my truck and leave it with a mechanic. I like to be there, see what's going on, how much everything is. So, I have responsibilities to make sure I get it done properly and the cheapest way that I can. And so that's a – a big distinction between me and the company drivers where they can just park their truck and go home. I can't do that. I have to make sure my truck is running, oil change, tire pressure, I have to do all that . . . because without my truck, I can't even work.

(R. 168.)

Pantoja's primary business asset is her truck. Her testimony is clear that maintaining that asset as economically as possible is the key to her

-20-

entrepreneurial success. The undisputed facts bearing on this second criterion mark Pantoja as an independent contractor.

### 3. *The source of the instrumentalities and tools*

Although the municipal solid waste Pantoja hauled is in trailers she did not own, it is the trailer itself she is contracted to haul. The tool used to do her work for Atomic Transport was her tractor unit. She was the source of that truck – the instrumentality or tool necessary to perform the contract. The undisputed facts bearing on this third criterion mark Pantoja as an independent contractor.

### 4. *Who determines the location of the work*

In the strictest sense, Pantoja performed her work in her truck's cab. Because she provided the truck, and her truck was the location where she performed the work, she determined where she worked. By contrast, Atomic Transport told its employee drivers of company trucks which one they were to drive, on which day, and where to drive it. Atomic Transport determined their work location, but not Pantoja's.

To the extent we consider the locations of the work to be where she picked-up and dropped-off trailers and the roadway between these points, we need only point out that she negotiated to acquire those routes, presumably because they were convenient to her business or personal premises and, therefore, sufficiently profitable to her business enterprise. Furthermore, as already noted, she had the

power to decline any of those individual routes on a case-by-case basis. *See* footnote 7, *supra*. She contracted where she would work.

The undisputed facts bearing on this fourth criterion mark Pantoja as an independent contractor.

5. *The duration of the relationship between the parties*

Laborers held to be employees in the cases cited by the Supreme Court in *Reid* had a "permanent working arrangement with the company under which they may continue as long as their performance is satisfactory." *NLRB v. United Ins. Co. of America*, 390 U.S. 254, 259, 88 S. Ct. 988, 991, 19 L. Ed. 2d 1083 (1968) (cited in *Reid*, *supra*, at 751-52, 109 S. Ct. at 2178-79); *Bartels*, 332 U.S. at 130, 67 S. Ct. at 1550 (noting "permanency of the relation") (cited in *Reid*, *supra*, at 751-52, 109 S. Ct. at 2178-79).

Paragraph 28 of the contract between Pantoja and Atomic Transport states its term as follows: "This Agreement shall remain in full force and effective for the period commencing at the time and date set forth in the Receipt for Possession of Contractor's Equipment attached hereto as Exhibit A [November 1, 2021] and continuing thereafter until terminated in accordance with the provisions of this Agreement." In the context of Paragraph 29, entitled "Termination," the

Agreement is perpetual until terminated upon either party's giving of 30-days' notice to the other party.[9]

The apparent permanency of this arrangement marks Pantoja as an employee under the fifth criterion.

6. *Whether the hiring party has the right to assign additional projects to the hired party*

We find no provision of the Independent Contractor Agreement that authorized Atomic Transport to assign additional duties beyond those Pantoja contracted to perform. Neither has Pantoja identified any such authority.

To the contrary, she testified the only way she would have performed other work was if she agreed to Atomic Transport's additional terms and she received additional compensation – *i.e.*, new consideration to modify the parties' agreement. This is consistent with hornbook and Kentucky contract law. As our Supreme Court said:

> We have long recognized "that parties who have the right to make a contract have the power to unmake or modify, regardless of self-imposed limitations; that by subsequent agreement based upon a sufficient consideration parties may modify their contract in any manner they choose; and that generally *a new consideration is required in order for an attempted modification for a contract to be valid*."

---

[9] It also provides circumstances under which termination can occur without 30-days' notice.

*Energy Home, Div. of Southern Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834

(Ky. 2013) (quoting *Vinaird v. Bodkin's Adm'x*, 254 Ky. 841, 72 S.W.2d 707, 711

(1934) (citing *Elliot on Contracts*, §§ 1987, 1989)) (emphasis added).

The undisputed material facts support the determination that Pantoja

was an independent contractor.

7. *The extent of the hired party's discretion over when and how long to work*

In our discussion of the means and manner the work was performed in

Section 1, *supra*, we noted Pantoja's control over when and how long she worked.

If she chose to reject a load, or chose not to show up at all, the choice was hers.

Pantoja testified that Atomic Transport had "an expectation" that drivers "get as

many loads as you could" during the hours the landfill was open, but the agreement

included no minimum or limit. Furthermore, because Pantoja was paid by the load

or ton, the more loads she could haul the more gross profit she made. However,

again, the Independent Contract Agreement gave Pantoja the ultimate discretion.

The undisputed facts bearing on this seventh criterion mark Pantoja as

an independent contractor.

8. *The method of payment*

Pantoja was not paid by the hour. Rather, her compensation

"depend[ed] on completion of a specific job, a method by which independent

contractors are often compensated." *Holt v. Winpisinger*, 811 F.2d 1532, 1540

(D.C. Cir. 1987) (cited in *Reid*, *supra*, at 751, 109 S. Ct. at 2179); RESTATEMENT (SECOND) OF AGENCY § 220(2)(g) ("the method of payment, whether by the time or by the job").

This method of compensating Pantoja reflects the parties' intention that Pantoja operate as an independent contractor.

9. *The hired party's role in hiring and paying assistants*

Paragraph 11 of the Independent Contractor Agreement establishes with clarity that Pantoja was required to "hire, supervise, train, discipline, fire, pay and set the pay, wages and other compensation of, set the hours and working conditions and adjust grievances of, all Employees" who were defined as "all drivers, helpers, flagmen and other labor . . . necessary to . . . perform [Pantoja's] obligations under this Agreement. . . . which Employees are and shall at all times remain the employees of" Pantoja. Pantoja's putative employees are referenced in Paragraphs 2, 10, 11, 12, 13, 15, 16, 18, 25, 27, 32, and 35 of the agreement which expressly absolves Atomic Transport from any responsibility for them.

Additionally, Pantoja obtained an Employer Identification Number which is required by the Internal Revenue Code if a taxpayer intends to hire employees. 26 C.F.R. § 31.6011(b)-1.

The undisputed facts bearing on this ninth criterion mark Pantoja as an independent contractor.

10. *Whether the work is part of the regular business of the hiring party and whether the hiring party is or is not in business*[10]

There is no dispute that Atomic Transport is in business and that the work Pantoja was contracted to perform is part of Atomic Transport's regular business – a "factor[] indicating the relation of master and servant." RESTATEMENT (SECOND) OF AGENCY § 220 cmt. h (1958); *United Ins. Co.*, 390 U.S. at 259, 88 S. Ct. at 991 (work was "essential part of the company's normal operations").

These facts mark Pantoja as an employee.

11. *Whether or not the person hired is or is not in business*[11]

The facts of this case make it clear that Pantoja created a business with the intention of operating that business for profit by hauling trailers with her

---

[10] Here, we merge criteria 10 and 11. The only authority *Reid* cites for its eleventh criterion – whether the *principal* is or is not in business – is the RESTATEMENT (SECOND) OF AGENCY § 220(2)(j). This Court read § 220, its comments, and the cases it references, as well as every citation to § 220(2)(j) we could find and no authority, including *Reid*, seems to know exactly what it means or how it factors in the calculus here. It seems logical that the eleventh criterion, if intended as written, must be subsumed in the tenth criterion – whether the work performed is part of the principal's regular business – and vice versa. The answer to whether the principal is in business must be yes if the answer to the tenth criterion is yes. And if the answer to the eleventh criterion is no, the answer to the tenth criterion must likewise be no.

Serendipitously or intentionally, the Arkansas Supreme Court seems to have solved the conundrum. When it reached this criterion, specifically citing § 220(2)(j), the Court misquoted that subsection and said: "The next factor to consider is 'whether or not *the one employed* is or is not a business.' *See Restatement Second of Agency* § 220(2)(j)." *ConAgra Foods, Inc. v. Draper*, 276 S.W.3d 244, 250 (Ark. 2008) (emphasis added). Whether § 220(2)(j) is just an amanuensis's mistake we do not know. But the Arkansas Court asks a far more relevant question in drawing the employee-independent contractor distinction. Was the person whose status we are determining in business for himself? That is a probative question. Therefore, we merged *Reid*'s tenth and eleventh criteria and added a new eleventh criterion to this nonexhaustive list.

[11] *See* footnote 10, *supra*.

own tractor unit. She acknowledged, "I have my own EIN number [Employer Identification Number]." (R. 157.) Significantly, she signed an exhibit to the Independent Contractor Agreement stating: "I am an owner-operator engaged in the operation of an independent business under which I lease my truck tractor to and perform services . . . ." (R. 248.) Her work history demonstrates her conscious decision to go into business for herself.

Pantoja testified that, before she bought her own truck, she drove a company-owned truck for a carrier she identified as Hub Group starting in November 2018. (R. 143.) But, in March of 2019, she purchased a 2010 International Prostar tractor, making "the conscious decision to become an owner-operator[.]" (*Id.*) She then left Hub Group and signed an independent contractor agreement with XPO Logistics Drayage driving her own tractor as an owner-operator from April 2019 to July 2019. This began a string of independent contractor relationships.

Before signing with Atomic Transport, Pantoja entered into similar independent contractor agreements, driving her own equipment as an owner-operator, with the following companies for the periods shown in the parentheticals following the company's name: Evans Delivery Company (August 2019 to November 2019); American Intermodal Logistics (July 2020 to January 2021);

Universal Intermodal Logistics (January 2021 to August 2021); Eagle Systems (September 2021 to October 2021). (R. 139-143.)

There are other indicia that Pantoja operated a business when she engaged with Atomic Transport but, in the absence of any countervailing proof, we conclude this is sufficient to answer the question. Based on this criterion, Pantoja was an independent contractor.

### 12. *The provision of employee benefits*

The proof is entirely one-sided and conclusive on this question. Atomic Transport neither agreed to, nor did it in fact, provide any employee benefits to Pantoja. This supports the conclusion she was an independent contractor.

### 13. *The tax treatment of the hired party*

Pantoja tells us how she and Atomic Transport treated her business for tax purposes in her own testimony:

> Q    Okay.  Were any taxes withheld from [your] pay?
>
> A    No because I'm a contract driver, 1099.
>
> Q    Okay.  What does that mean to be a 1099?
>
> A    That means I'm an owner operator.  I have my own
>      EIN number, and so I'm responsible for my taxes in
>      the end of the year.

(R. 157.)   Such tax treatment is how an independent contractor pays taxes.

*14. Whether the parties believe they created an employment relationship*

Because the *Steilberg/Reid* criteria is nonexhaustive, we mention another factor suggested by the Restatement – "Whether or not the parties believe they are creating the relation of master and servant[.]" RESTATEMENT (SECOND) OF AGENCY § 220(2)(i). This is listed as a factor in *Landmark Community Newspapers*, *supra*, but never discussed. 91 S.W.3d at 579 (citing RESTATEMENT (SECOND) OF AGENCY § 220). The factor is relevant here because the record clearly shows Pantoja knew she was creating an independent contractor relationship with Atomic Transport. We perceive her suggestion otherwise as disingenuous. This was not the first independent contractor relationship she created – the kind of relationship she consciously pursued when she purchased her own tractor unit and became an entrepreneur.

## CONCLUSION

The record reveals there is no genuine issue regarding any material fact necessary to the legal determination whether Pantoja was an employee and protected by the KCRA or an independent contractor and not protected. Although not every factor points to a finding that Pantoja was an independent contractor, the vast majority do. The record readily reflects she was an independent contractor.

Therefore, we affirm the Jefferson Circuit Court's July 17, 2023 Summary Judgment in favor of Appellees.

ALL CONCUR.


BRIEFS FOR APPELLANT:          BRIEF FOR APPELLEES:

Andrew S. Epstein              B. Scott Jones
Louisville, Kentucky           Louisville, Kentucky